**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ADAM POTTER,<br><br>        Plaintiff/Counterclaim Defendant,<br><br>    v.<br><br>BEACON INTERCONTINENTAL GROUP,<br>INC. and BUSINESS INSURANCE<br>HOLDINGS, INC.,<br><br>        Defendants/Counterclaim Plaintiffs. | Civil Case No. 1:20-cv-4599 (JGK) (OTW)<br><br><br>**DEFENDANTS' THIRD AMENDED<br>ANSWER, AFFIRMATIVE<br>DEFENSES, AND COUNTERCLAIMS** |

Defendants Beacon Intercontinental Group, Inc. ("Beacon") and Business Insurance

Holdings, Inc. ("BIH") (collectively, "Defendants"), by and through their undersigned counsel,

DLA Piper LLP (US), respectfully submit this Third Amended Answer, Affirmative Defenses, and

Counterclaims to the Amended Complaint of Plaintiff Adam Potter ("Plaintiff"), dated August 18,

2020, and state as follows:[1]

## NATURE OF ACTION

1.      Defendants admit that Plaintiff's Amended Complaint alleges breach of contract,

declaratory relief, and unjust enrichment.  Defendants deny that Plaintiff is entitled to such relief.

## PARTIES

2.      Defendants admit the allegations in Paragraph 2 of the Amended Complaint.

3.      Defendants admit that Defendant Beacon is incorporated under the laws of the State

of Delaware but deny all remaining allegations in Paragraph 3 of the Amended Complaint.

---

[1] Defendants have herein adopted the headings from the Amended Complaint for ease of reference.
To the extent that such headings themselves contain factual or legal statements, allegations, or
characterizations of any form or type, Defendants deny those statements, allegations, or
characterizations.

4.     Defendants admit that Defendant BIH is incorporated under the laws of the State of Florida but deny all remaining allegations in Paragraph 4 of the Amended Complaint.

## JURISDICTION AND VENUE

5.     The allegations in Paragraph 5 of the Amended Complaint set forth a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny such legal conclusion.

6.     Defendants admit that both Plaintiff and Defendants agreed to submit to the exclusive jurisdiction of any State or Federal Court sitting in the Borough of Manhattan in the City of New York over any action arising out of or relating to the Stock Purchase Agreement (the "SPA") executed by Plaintiff and Defendants on September 3, 2019.  The allegations in Paragraph 6 of the Amended Complaint set forth a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 6 of the Amended Complaint also cite to and purport to rely on a document, the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 6 of the Amended Complaint.

7.     The allegations in Paragraph 7 of the Amended Complaint set forth a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 7 of the Amended Complaint also cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 7 of the Amended Complaint.

8.   The allegations in Paragraph 8 of the Amended Complaint set forth a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 8 of the Amended Complaint also cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 8 of the Amended Complaint.

9.   The allegations in Paragraph 9 of the Amended Complaint set forth a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny such legal conclusion.

10.   Defendants admit that Plaintiff and Defendants agreed that Manhattan County would be an appropriate forum for any lawsuits arising out of a breach of the SPA.  The allegations in Paragraph 10 of the Amended Complaint set forth a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny such legal conclusion.

### FACTUAL ALLEGATIONS

**I.   Potter Acquires a Struggling BIH in August 2016 and Quickly Restores BIH's Status as a Leading Resource for the Insurance Industry**

11.   Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 11 of the Amended Complaint and, therefore, Defendants deny the allegations.

12.   Defendants admit the allegations in Paragraph 12 of the Amended Complaint from the period after which Defendant Beacon acquired Defendant BIH from Plaintiff.  Defendants are without knowledge or information sufficient to admit the remaining allegations in Paragraph 12 of the Amended Complaint and, therefore, Defendants deny all remaining allegations.

13.     Defendants admit the allegations in Paragraph 13 of the Amended Complaint from the period after which Defendant Beacon acquired Defendant BIH from Plaintiff.  Defendants are without knowledge or information sufficient to admit the remaining allegations in Paragraph 13 of the Amended Complaint and, therefore, Defendants deny all remaining allegations.

14.     Defendants admit that, from the period after which Defendant Beacon acquired Defendant BIH, BIH has actively marketed its services in the United States.  Defendants deny all remaining allegations in Paragraph 14 of the Amended Complaint.

15.     Defendants admit the allegations in Paragraph 15 of the Amended Complaint.

16.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 16 of the Amended Complaint and, therefore, Defendants deny the allegations.

17.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 17 of the Amended Complaint and, therefore, Defendants deny the allegations.

18.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 18 of the Amended Complaint and, therefore, Defendants deny the allegations.

19.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 19 of the Amended Complaint and, therefore, Defendants deny the allegations.

20.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 20 of the Amended Complaint and, therefore, Defendants deny the allegations.

21.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 21 of the Amended Complaint and, therefore, Defendants deny the allegations.

22.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 22 of the Amended Complaint and, therefore, Defendants deny the allegations.

23.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 23 of the Amended Complaint and, therefore, Defendants deny the allegations.

## II.     The Acuntos Contact Potter to Acquire BIH

24.     Defendants deny that Steve Acunto, III ("Mr. Acunto") initiated communication with Plaintiff concerning purchasing Defendant BIH from Plaintiff, but Defendants admit that on June 13, 2019, Mr. Acunto and Plaintiff communicated by e-mail concerning Plaintiff selling BIH to Mr. Acunto or an entity Mr. Acunto owned or controlled.  Defendants deny all remaining allegations in Paragraph 24 of the Amended Complaint.

25.     Defendants admit that Mr. Acunto agreed with Plaintiff's emphasis that the parties conduct the due diligence process with celerity concerning Mr. Acunto's potential acquisition of Defendant BIH from Plaintiff.  Defendants deny the allegations in Paragraph 25 of the Amended Complaint to the extent they suggest that Mr. Acunto, not Plaintiff, emphasized "celerity."

26.     Defendants admit that Mr. Acunto requested that Plaintiff provide the information described in Paragraph 26 of the Amended Complaint to his son, Steve Acunto, IV.  Defendants deny all remaining allegations in Paragraph 26 of the Amended Complaint.

27.     Defendants deny the allegations in Paragraph 27 of the Amended Complaint.

28.     Defendants deny the allegations in Paragraph 28 of the Amended Complaint.

29.     Defendants admit that the SPA sets a $5 million purchase price for BIH as follows: (1) a payment of $4 million due at closing; and (2) an additional payment of $1 million subject to certain conditions precedent based on BIH reaching certain revenue thresholds which conditions have not been met.  The allegations in Paragraph 29 of the Amended Complaint also cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 29 of the Amended Complaint.

30.     Defendants admit that Defendant Beacon and Plaintiff negotiated a purchase price for BIH of 5 times BIH's EBITDA as represented by Plaintiff in his express representations about BIH's financial performance during 2018 and 2019.  Defendants deny all remaining allegations in Paragraph 30 of the Amended Complaint and its accompanying footnote.

31.     Defendants deny the allegations in Paragraph 31 of the Amended Complaint and further note that Plaintiff's representations during due diligence concerning Defendant BIH's purported net income, revenue, and EBITDA were the key factors in Defendant Beacon's decision to purchase Defendant BIH.

32.     Defendants admit the allegations in Paragraph 32 of the Amended Complaint accurately attribute the quoted language to Mr. Acunto.  Defendants, however, deny the allegations contained in Paragraph 32 of the Amended Complaint to the extent Plaintiff suggests such statement is a representation concerning accuracy of the financial information, such as net income, revenue, and EBITDA, that Plaintiff provided Mr. Acunto concerning Defendant BIH during Mr. Acunto's due diligence with Plaintiff preceding the execution of the SPA.

33.     The allegations in Paragraph 33 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 33 of the Amended Complaint.

34.     Defendants admit that Mr. Acunto and Carole Acunto (the "Acuntos") were represented by counsel upon closing on the SPA with Plaintiff.  Defendants deny all remaining allegations in Paragraph 34 of the Amended Complaint.

35.     Defendants admit that the Acuntos consulted with accountants concerning the financial information, including net income, revenue, and EBITDA, that Plaintiff provided the Acuntos concerning Defendant BIH during the due diligence preceding the execution of the SPA. Defendants deny that such financial information was accurate.  Defendants further note that the Acuntos could not corroborate the accuracy of such financial information because Plaintiff did not provide the Acuntos with timely access to Defendant BIH's financial records, which Plaintiff maintained on the accounting software QuickBooks (the "QuickBooks Accounting Records"), as required under the SPA.  Defendants deny all remaining allegations in Paragraph 35 of the Amended Complaint.

III.    <u>**Acunto Sr. Forms Beacon as a Holding Company to Purchase BIH**</u>

36.     Defendants admit the allegations in Paragraph 36 of the Amended Complaint.

37.     Defendants admit the allegations in Paragraph 37 of the Amended Complaint.

38.     Defendants admit the allegations in Paragraph 38 of the Amended Complaint. Defendants, however, deny that they share any legal relationship with CINN Group.

39.     Defendants admit that Beacon acquired BIH from Plaintiff.  Defendants deny all remaining allegations in Paragraph 39 of the Amended Complaint.

40.     Defendants admit that Mr. Acunto and Carole Acunto are officers of Defendant Beacon.   Defendants further admit that Mr. Acunto is a shareholder of Defendant Beacon. Defendants deny that Carole Acunto is a shareholder of Defendant Beacon.

## IV.     The Stock Purchase Agreement and its Terms

41.     Defendants admit that Defendant Beacon and Plaintiff executed the SPA on September 3, 2019.  The allegations in Paragraph 41 of the Amended Complaint also cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 41 of the Amended Complaint.

42.     Defendants admit the allegations in Paragraph 42 of the Amended Complaint.

43.     Defendants admit the allegations in Paragraph 43 of the Amended Complaint.

44.     The allegations in Paragraph 44 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 44 of the Amended Complaint.

45.     Defendants admit that the SPA sets a $5 million purchase price for BIH as follows: (1) a payment of $4 million due at closing; and (2) an additional payment of $1 million subject to conditions precedent based on BIH reaching certain revenue thresholds (the "Final Payment"). The allegations in Paragraph 45 of the Amended Complaint also cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are

inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 45 of the Amended Complaint.

46.    Defendants admit that Defendant Beacon executed a promissory note regarding the Final Payment that contained the same conditions precedent in the SPA concerning the Final Payment. The allegations in Paragraph 46 of the Amended Complaint also cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 46 of the Amended Complaint.

47.    The allegations in Paragraph 47 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 47 of the Amended Complaint.

48.    The allegations in Paragraph 48 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 48 of the Amended Complaint.

49.    The allegations in Paragraph 49 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they

are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 49 of the Amended Complaint.

50.     The allegations in Paragraph 50 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 50 of the Amended Complaint.

51.     The allegations in Paragraph 51 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 51 of the Amended Complaint.

52.     The allegations in Paragraph 52 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 52 of the Amended Complaint.

53.     The allegations in Paragraph 53 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.

54.     The allegations in Paragraph 54 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is

required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 54 of the Amended Complaint.

55.     The allegations in Paragraph 55 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 55 of the Amended Complaint.

56.     The allegations in Paragraph 56 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 56 of the Amended Complaint.

57.     Defendants admit that the Institutes commenced an action titled *The American Institute for Chartered Property Casualty Underwriters, et al. v. Potter, et al.*, No. 1:19-cv-1600-CFC ("Delaware Federal Action") against Plaintiff in the Delaware District Court.  Defendants are without knowledge or information sufficient to admit the remaining allegations in Paragraph 57 of the Amended Complaint and, therefore, Defendants deny the allegations.

58.     The allegations in Paragraph 58 of the Amended Complaint reference the allegations by The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC in the Delaware Federal Action, contained in the amended and supplemental complaint in the Delaware Federal Action and attached hereto as **Exhibit 7**, which speaks for itself and for which no response in required.  To the extent a response is required, Defendants deny the

allegations to the extent they are inconsistent with, paraphrase, or re-characterize the amended and supplemental complaint in the Delaware Federal Action. Defendants deny all remaining allegations in Paragraph 58 of the Amended Complaint.

59.     Defendants deny the allegations in Paragraph 59 of the Amended Complaint.

60.     The allegations in Paragraph 60 of the Amended Complaint purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 60 of the Amended Complaint.

61.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 61 of the Amended Complaint and, therefore, Defendants deny the allegations.

62.     The allegations in Paragraph 62 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 62 of the Amended Complaint.

63.     The allegations in Paragraph 63 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA. Defendants deny all remaining allegations in Paragraph 63 of the Amended Complaint.

64.     The allegations in Paragraph 64 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 64 of the Amended Complaint.

65.     The allegations in Paragraph 65 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 65 of the Amended Complaint.

66.     The allegations in Paragraph 66 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 66 of the Amended Complaint.

**V.**     **Potter and Beacon Close on the SPA**

67.     Defendants admit the allegations in Paragraph 67 of the Amended Complaint.

68.     Defendants admit the allegations in Paragraph 68 of the Amended Complaint.

69.     The allegations in Paragraph 69 of the Amended Complaint cite to and purport to rely on the Unsecured Promissory Note (the "Note") referenced in Section 1.02 of the SPA and attached hereto as **Exhibit 2**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants admit that Defendant Beacon executed the Note setting forth the Final Payment to Plaintiff subject to the conditions precedent of BIH reaching certain revenue thresholds.  Defendants further deny the allegations to the extent they are inconsistent

with, paraphrase, or re-characterize the Note.   Defendants deny all remaining allegations in Paragraph 69 of the Amended Complaint.

70.     The allegations in Paragraph 70 of the Amended Complaint cite to and purport to rely on the Note referenced in Section 1.02 of the SPA, attached hereto as **Exhibit 2**, which speaks for itself and to which no response is required.   To the extent a response is required, Defendants admit that Defendant Beacon executed the Note setting forth the Final Payment to Plaintiff subject to the conditions precedent of BIH reaching certain revenue thresholds.   Defendants further deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the Note. Defendants deny all remaining allegations in Paragraph 70 of the Amended Complaint.

71.     The allegations in Paragraph 71 of the Amended Complaint cite to and purport to rely upon two documents incorporated by reference in the SPA: (1) Plaintiff's resignation from Defendant BIH, executed on September 3, 2019 and attached thereto as Exhibit C; ("Resignation Letter") and (2) Plaintiff's Agreement Not To Compete, executed by Plaintiff and Defendant BIH on September 3, 2019 and attached thereto as Exhibit D ("SPA Non-Compete"), which speak for themselves and to which no response is required.   To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the Resignation Letter, SPA Non-Compete, or SPA.   Defendants deny all remaining allegations in Paragraph 71 of the Amended Complaint.

72.     The allegations in Paragraph 72 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.   To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.   Defendants further admit that the SPA required Plaintiff to provide Defendant Beacon with timely access to Defendant BIH's books

and records, but deny that Plaintiff provided Defendant Beacon with timely access to Defendant BIH's books and records or that such books and records accurately reflected Defendant BIH's financial information, including net income, revenue, and EBITDA. Defendants deny all remaining allegations in Paragraph 72 of the Amended Complaint.

**VI.    Defendants Default on Their Obligations Under the SPA**

73.    Defendants admit that Defendant Beacon requested until December 31, 2019 to make Plaintiff a reconciliation payment, if any due, as calculated and defined in the SPA. Defendants deny that Plaintiff provided Defendant Beacon with timely access to BIH's books, records, including the QuickBooks Accounting Records, deny that such records accurately reflected BIH's financials, including net income, revenue, and EBITDA, and, as such, deny that Plaintiff satisfied the conditions precedent on which the reconciliation payment was subject to according to the SPA. Defendants deny all remaining allegations in Paragraph 73 of the Amended Complaint.

74.    Defendants admit that Plaintiff agreed to Defendant Beacon's request that Defendant Beacon delay making Plaintiff a reconciliation payment, if any due, as calculated and defined in the SPA. Defendants deny that any such reconciliation payment was due as Plaintiff failed to satisfy the conditions precedent on which the reconciliation payment was subject to according to the SPA. Defendants deny all remaining allegations in Paragraph 74 of the Amended Complaint.

75.    Defendants admit that Defendant Beacon requested until December 31, 2019 to make Plaintiff a reconciliation payment, if any due, as calculated and defined in the SPA. Defendants, however, deny that the Acuntos could properly evaluate Defendant BIH's financial records, including net income, revenue, and EBITDA, before executing the SPA because Plaintiff

failed to provide the Acuntos with accurate and complete information preceding the execution of the SPA.  Defendants deny all remaining allegations in Paragraph 75 of the Amended Complaint.

76.     The allegations in Paragraph 76 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that the Acuntos could properly evaluate Defendant BIH's financial records, including net income, revenue, and EBITDA, before executing the SPA because Plaintiff failed to provide the Acuntos with accurate and complete information preceding the execution of the SPA.  Defendants further deny that any additional payments were due to Plaintiff because Plaintiff failed to satisfy the conditions precedent on which such payments were subject to according to the SPA.  Defendants deny all remaining allegations in Paragraph 76 of the Amended Complaint.

77.     Defendants admit that Defendant Beacon requested access to BIH's books, records, and accounting software, including the QuickBooks Accounting Records, pursuant to the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 77 of the Amended Complaint.

78.     Defendants deny the allegations in Paragraph 78 of the Amended Complaint.

79.     Defendants deny the allegations in Paragraph 79 of the Amended Complaint.

80.     Defendants admit that Defendant Beacon did not make any reconciliation payment. Defendants deny Plaintiff was entitled to any reconciliation payment because Plaintiff failed to satisfy the conditions precedent on which the reconciliation payment was subject to according to the SPA.  Defendants deny all remaining allegations in Paragraph 80 of the Amended Complaint.

81.     The allegations in Paragraph 81 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is

required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants admit that Defendant Beacon did not make the Final Payment.  Defendants deny that Plaintiff was entitled to the Final Payment because Plaintiff failed to satisfy the conditions precedent on which the Final Payment was subject to according to the SPA.  Defendants deny all remaining allegations in Paragraph 81 of the Amended Complaint.

82.     Defendants admit that Stephen Acunto Sr. sent Plaintiff an e-mail on December 27, 2019 informing Plaintiff that Plaintiff purposefully misrepresenting BIH's EBIDTA and disclaiming Defendant Beacon's obligations to make any additional payments under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 82 of the Amended Complaint.

83.     Defendants admit that Plaintiff responded to Mr. Acuntos e-mail referenced in Paragraph 82 of the Amended Complaint.  Defendants deny that Plaintiff provided the Acuntos with accurate financial records concerning Defendant BIH during the parties' due diligence, including revenue, net income, and EBITDA, and deny that Plaintiff provided timely access to Defendant BIH's accounting software, including the QuickBooks Accounting Records. Defendants deny all remaining allegations in Paragraph 83 of the Amended Complaint.

84.     The allegations in Paragraph 84 of the Amended Complaint cite to and purport to rely on a written communication, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the communication.  Defendants further note they are without knowledge or information sufficient to admit the allegations in Paragraph 84 of the Amended Complaint and, therefore, Defendants deny the allegations.  Defendants deny that Plaintiff provided accurate financial records concerning Defendant BIH, including revenue, net income,

and EBITDA.  Defendants deny all remaining allegations in Paragraph 84 of the Amended Complaint.

85.    Defendants admit the allegations in Paragraph 85 of the Amended Complaint.

86.    Defendants deny that Mr. Acunto did not respond to the e-mail referenced in Paragraphs 83-85 of the Amended Complaint.  Defendants further note that Mr. Acunto could not provide a calculation for Defendant BIH's EBITDA at that time because Plaintiff failed to provide timely access to Defendant BIH's financial records, including revenue, net income, EBITDA, and the QuickBooks Accounting Records, as required under the SPA.

87.    The allegations in Paragraph 87 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants admit that Plaintiff e-mailed Carole Acunto on December 30, 2019 regarding Plaintiff's healthcare benefits.  Defendants deny all remaining allegations in Paragraph 87 of the Amended Complaint.

88.    The allegations in Paragraph 88 of the Amended Complaint cite to and purport to rely on a written communication, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the communication.  Defendants deny all remaining allegations in Paragraph 88 of the Amended Complaint.

89.     The allegations in Paragraph 89 of the Amended Complaint cite to and purport to rely on a written communication, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent

with, paraphrase, or re-characterize the communication.   Defendants deny all remaining allegations in Paragraph 89 of the Amended Complaint.

90.     Defendants admit that Plaintiff inflated BIH's revenue, net income, and EBITDA through at least 10 transactions between August 24, 2018 and August 23, 2019, which were improperly recorded as revenue to BIH in BIH's QuickBooks Accounting Records.   Defendants deny all remaining allegations in Paragraph 90 of the Amended Complaint.

91.     Defendants deny the allegations in Paragraph 91 of the Amended Complaint. Defendants further note that Plaintiff did not disclose the transactions cited in Paragraph 91 of the Amended Complaint during the due diligence period and that the Acuntos only learned about these transactions after closing once they belatedly received access to Defendant BIH's QuickBooks Accounting Records from Plaintiff.   Defendants further note that Plaintiff admitted after closing on the SPA that Plaintiff incorrectly recorded transactions as revenue in Defendant BIH's QuickBooks Accounting Records.   Defendants deny that the ten transactions alleged in Paragraph 91 of the Amended Complaint did not impact the purchase price of Defendant BIH.

92.     Defendants deny the allegations in Paragraph 92 of the Amended Complaint and note that the Acuntos asked Plaintiff for supporting documentation regarding all transactions relevant to BIH's purported EBITDA.

93.     Defendants admit that at least eight fraudulent transactions occurred before June 13, 2019.  Defendants deny the remaining allegations in Paragraph 93 of the Amended Complaint.

94.     Defendants admit that at least one fraudulent transaction occurred between July and December 2019.   Defendants deny the remaining allegations in Paragraph 94 of the Amended Complaint.

95.     The allegations in Paragraph 95 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants further deny the allegations in Paragraph 95 of the Amended Complaint to the extent they suggest that Plaintiff did not have an obligation under the SPA to provide complete, truthful and accurate financial records concerning Defendant BIH, including that concerning revenue, net income, and EBITDA.  Defendants admit that the parties agreed upon the purchase price of Defendant BIH under the SPA based on BIH's EBITDA which, in turn, was based on information provided by Plaintiff during the due diligence period which the Acuntos were led to believe was accurate and on which the Acuntos relied.  Defendants deny that such information provided during the due diligence period was accurate and, in fact, it had been fabricated by Plaintiff.  Defendants deny the remaining allegations in Paragraph 95 of the Amended Complaint.

96.     The allegations in Paragraph 96 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants admit the Acuntos provided Plaintiff with notice on December 30, 2019 that Plaintiff breached the SPA.  Defendants deny all remaining allegations in Paragraph 96 of the Amended Complaint.

97.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 97 of the Amended Complaint and, therefore, Defendants deny the allegations.

98.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 98 of the Amended Complaint and, therefore, Defendants deny the allegations.

99.     Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 99 of the Amended Complaint and, therefore, Defendants deny the allegations.

100.    The allegations in Paragraph 100 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny that Plaintiff is entitled to be reimbursed for medical benefits under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 100 of the Amended Complaint.

101.    Defendants deny the allegations in Paragraph 101 of the Amended Complaint.

102.    Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 102 of the Amended Complaint, including whether Plaintiff is owed reimbursement, and, therefore, Defendants deny the allegations.

**VII.    Potter Initiates an Action on the Promissory Note and Obtains a Default Judgment Against Beacon in the Superior Court of Delaware**

103.    Defendants admit that Plaintiff filed the Delaware State Action against Defendant Beacon in Delaware Superior Court on January 30, 2020.  Defendants deny that Defendant Beacon had knowledge of the Delaware State Action until June 2020.

104.    Defendants admit the allegations in Paragraph 104 of the Amended Complaint that, based on documentation submitted by Plaintiff in the Delaware State Action, Plaintiff appears to have had a Kent County, Delaware Sheriff serve Beacon's registered agent in Delaware with a

summons and a copy of the complaint filed in the Delaware State Action, which was promptly dismissed by Plaintiff after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct.  Defendants deny that any service of the Delaware State Action complaint on Defendant Beacon's registered agent provided Defendant Beacon with actual notice of the Delaware State Action.  Defendants deny that Defendant Beacon had knowledge of the Delaware State Action until June 2020.  Defendants further note that Plaintiff did not provide a courtesy copy of the complaint in the Delaware State Action nor the default judgment it later obtained on March 5, 2020 against Defendant Beacon despite Plaintiff's counsel's simultaneous communication with counsel for Defendants concerning the Delaware Federal Action.

105.    Defendants admit that the requisite Delaware state civil practice rules specify that a defendant must respond to a complaint within 20 days after service of the summons and complaint on a defendant.  Defendants deny that Defendant Beacon had actual notice of the Delaware State Action at any time before March 4, 2020.  Defendants note that Plaintiff promptly dismissed the Delaware State Action after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct.  Defendants further deny that Defendant Beacon had notice to appear in and defend against the Delaware State Action by March 4, 2020. Defendants further note that Defendant Beacon did not have knowledge of the Delaware State Action until June 2020.  Defendants further note that Plaintiff did not provide a courtesy copy of the complaint in the Delaware State Action nor the default judgment it later obtained on March 5, 2020 against Defendant Beacon despite Plaintiff's counsel's simultaneous communication with counsel for Defendants concerning the Delaware Federal Action.  Defendants further note that Defendant Beacon could have had actual notice of the complaint filed in the Delaware State Action had counsel for Plaintiff done so.

106.    Defendants deny that Defendant Beacon had actual notice of the complaint filed in the Delaware State Action on February 13, 2020, which action was promptly dismissed by Plaintiff after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct.  Defendants further deny that Defendant Beacon had actual notice of the Delaware State Action at any time before March 4, 2020.  Defendants further deny that Defendant Beacon had notice to appear in and defend against the Delaware State Action by March 4, 2020.  Defendants further note that Defendant Beacon did not have knowledge of the Delaware State Action until June 2020.  Defendants further note that Plaintiff did not provide a courtesy copy of the complaint in the Delaware State Action nor the default judgment it later obtained on March 5, 2020 against Defendant Beacon despite Plaintiff's counsel's simultaneous communication with counsel for Defendants concerning the Delaware Federal Action.  Defendants further note that Defendant Beacon could have had actual notice of the complaint filed in the Delaware State Action had counsel for Plaintiff done so.

107.    Defendants deny that Defendant Beacon had actual notice of the complaint filed in the Delaware State Action on February 13, 2020, which action was promptly dismissed by Plaintiff after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct.  Defendants further deny that Defendant Beacon had actual notice of the Delaware State Action at any time before March 4, 2020.  Defendants further deny that Defendant Beacon had notice to appear in and defend against the Delaware State Action by March 4, 2020.  Defendants further note that Defendant Beacon did not have knowledge of the Delaware State Action until June 2020.  Defendants further note that Plaintiff did not provide a courtesy copy of the complaint in the Delaware State Action nor the default judgment it later obtained on March 5, 2020 against Defendant Beacon despite Plaintiff's counsel's simultaneous communication with

counsel for Defendants concerning the Delaware Federal Action.  Defendants further note that Defendant Beacon could have had actual notice of the complaint filed in the Delaware State Action had counsel for Plaintiff done so.

108.    Defendants deny that Defendant Beacon had actual notice of the complaint filed in the Delaware State Action on February 13, 2020, which action was promptly dismissed by Plaintiff after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct.  Defendants further deny that Defendant Beacon had actual notice of the Delaware State Action at any time before March 4, 2020.  Defendants further deny that Defendant Beacon had notice to appear in and defend against the Delaware State Action by March 4, 2020. Defendants further note that Defendant Beacon did not have knowledge of the Delaware State Action until June 2020.  Defendants further note that Plaintiff did not provide a courtesy copy of the complaint in the Delaware State Action nor the default judgment it later obtained on March 5, 2020 against Defendant Beacon despite Plaintiff's counsel's simultaneous communication with counsel for Defendants concerning the Delaware Federal Action.  Defendants further note that Defendant Beacon could have had actual notice of the complaint filed in the Delaware State Action had counsel for Plaintiff done so.

109.    Defendants admit that, based on documentation submitted by Plaintiff in the Delaware State Action, Plaintiff appears to have directed the Delaware Prothonotary on March 5, 2020 to enter a clerk's judgment as to Defendant Beacon in the Delaware State Action, which was promptly dismissed by Plaintiff after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct.  Defendants deny that such default was properly obtained and refer to the July 17 Order from Judge LeGrow of the Delaware Superior Court vacating the default after finding "extraordinary circumstances" existed for doing so, pointing to

Plaintiff and his counsel's improper conduct.  Among other things, the Court found it would vacate the default "solely on the fact that Mr. Potter, represented by counsel, was aware that the defendants were disputing the debt [at issue in the Delaware State Action]; was aware that the [D]efendants were represented by counsel relating to that very dispute; filed the complaint [in the Delaware State Action]; entered the direction for entry of default judgment; and never once provided a courtesy copy of th[e] [Delaware State Action] complaint or the default judgment, once it was obtained, to counsel." (Transcript of July 17 Hearing at 60:12-21.)  The Court went further to note that "what makes this a particularly troubling case and what makes me more than confident that Rule 60(b)(6) [permitting the court "a grand reservoir of equitable power to do justice in a particular case"] is the appropriate relief here is what happened thereafter" and "that, specifically, is that with default judgment in hand, Mr. Potter's counsel then sought to represent Beacon's subsidiary, BIH, in separate but related litigation without disclosing the existence of the conflict. And, to me, it is a very clear conflict under Rule 1.7 of the Rules of Professional Conduct." (*Id.*, 61:12-23.)  The Court went further in justifying vacating the default and admonishing Plaintiff's counsel by stating "then to compound the error, Potter now contends that the defendants in this action, the Acuntos and Beacon's refusal of that representation, when there was a very clear conflict of interest that would prevent the representation absent an informed consent in writing, under rule 1.7, Potter now contends that the refusal amounts to a breach of the SPA and **has so argued in the Southern District of New York**. So, at best, this is a breakdown in communication between counsel.  At best.  I think it's something much less unintentional than that.  Or, to avoid the double negative, **much more intentional than that**, and so this Court is not going to be a tool by which parties or their counsel try to gain a leg up in other litigation or try to mask what is going on for purposes of achieving something in other related disputes." (*Id.*, 62:3-23.)

110.    Defendants admit that, based on documentation submitted by Plaintiff in the Delaware State Action, Plaintiff appears to have obtained a clerk's judgment as to Defendant Beacon on March 10, 2020, which was promptly dismissed by Plaintiff after he and his counsel were admonished by Delaware Superior Court Judge Abigail LeGrow for their conduct. Defendants deny that such default was properly obtained and refer to the July 17 Order from Judge LeGrow of the Delaware Superior Court vacating the default after finding "extraordinary circumstances" existed for doing so, pointing to Plaintiff and his counsel's improper conduct. Among other things, the Court found it would vacate the default "solely on the fact that Mr. Potter, represented by counsel, was aware that the defendants were disputing the debt [at issue in the Delaware State Action]; was aware that the [D]efendants were represented by counsel relating to that very dispute; filed the complaint [in the Delaware State Action]; entered the direction for entry of default judgment; and never once provided a courtesy copy of th[e] [Delaware State Action] complaint or the default judgment, once it was obtained, to counsel." (Transcript of July 17 Hearing at 60:12-21.) The Court went further to note that "what makes this a particularly troubling case and what makes me more than confident that Rule 60(b)(6) [permitting the court "a grand reservoir of equitable power to do justice in a particular case"] is the appropriate relief here is what happened thereafter" and "that, specifically, is that with default judgment in hand, Mr. Potter's counsel then sought to represent Beacon's subsidiary, BIH, in separate but related litigation without disclosing the existence of the conflict. And, to me, it is a very clear conflict under Rule 1.7 of the Rules of Professional Conduct." (*Id.*, 61:12-23.) The Court went further in justifying vacating the default and admonishing Plaintiff's counsel by stating "then to compound the error, Potter now contends that the defendants in this action, the Acuntos and Beacon's refusal of that representation, when there was a very clear conflict of interest that would prevent the

representation absent an informed consent in writing, under rule 1.7, Potter now contends that the refusal amounts to a breach of the SPA and **has so argued in the Southern District of New York**. So, at best, this is a breakdown in communication between counsel.  At best.  I think it's something much less unintentional than that.  Or, to avoid the double negative, **much more intentional than that**, and so this Court is not going to be a tool by which parties or their counsel try to gain a leg up in other litigation or try to mask what is going on for purposes of achieving something in other related disputes."  (*Id.*, 62:3-23.)

## VIII.  BIH Refuses Potter His Contractual Right to Indemnify BIH and Assume and Control Its Defense in the Delaware District Court Action

111.    Defendants admit the allegations in Paragraph 111 of the Amended Complaint and note that the amendment came after Plaintiff, through his counsel, identified BIH as the proper party to sue in the Delaware Federal Action and encouraged the Institutes to amend the complaint to name BIH.

112.    The allegations contained in Paragraph 112 of the Amended Complaint cite to and purport to rely on two documents—the SPA, attached hereto as **Exhibit 1**, and an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10** — which speak for themselves and to which no response in required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize these documents and further denies that Plaintiff had the right to assume and control Defendant BIH's defense in the Delaware Federal Action via Plaintiff's counsel.  Defendants deny all remaining allegations in Paragraph 112 of the Amended Complaint.

113.    Defendants admit the allegations in Paragraph 113 of the Amended Complaint.

114.     The allegations contained in Paragraph 114 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document.

115.     The allegations contained in Paragraph 115 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document and further denies that Plaintiff had the right to assume and control Defendant BIH's defense in the Delaware Federal Action via Plaintiff's counsel.  Defendants deny all remaining allegations in Paragraph 115 of the Amended Complaint.

116.     The allegations contained in Paragraph 116 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document.  Defendants further note that Defendant BIH refused to allow Plaintiff to assume and control its defense in the Delaware Federal Action via counsel for Plaintiff—the only counsel offered by Plaintiff and the refusal of which prompted counsel for Plaintiff to improperly claim that Defendant Beacon was in breach of the SPA.  Defendants further deny that Defendants breached the SPA.  As such, Defendants admit that counsel for Defendants refused to allow Plaintiff to assume and control

BIH's defense in the Delaware Federal Action via Plaintiff's counsel, as doing so presented two conflicts: (1) counsel for Plaintiff could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH.  Defendants deny all remaining allegations in Paragraph 116 of the Amended Complaint.

117.    The allegations contained in Paragraph 117 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document.  Defendants admit that The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC (collectively, the "Institutes") filed an amended complaint in *The American Institutes for Chartered Property Casualty Underwriters, et al. v. Potter, et al.*, No. 1:19-cv-1600 (D. Del) (the "Institutes Action") to assert legal claims against BIH at Plaintiff's insistence and invitation. Defendants further note that Defendant BIH refused to allow Plaintiff to assume and control its defense in the Delaware Federal Action via counsel for Plaintiff—the only counsel offered by Plaintiff and the refusal of which prompted counsel for Plaintiff to improperly claim that Defendant Beacon was in breach of the SPA.  Defendants further deny that Defendants breached the SPA.  As such, Defendants admit that counsel for Defendants refused to allow Plaintiff to assume and control BIH's defense in the Delaware Federal Action via Plaintiff's counsel, as doing so presented two conflicts: (1) counsel for Plaintiff could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due

to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH. Defendants deny all remaining allegations in Paragraph 117 of the Amended Complaint.

118.    The allegations contained in Paragraph 118 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document.

119.    The allegations contained in Paragraph 119 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document. Defendants further note that Defendant BIH refused to allow Plaintiff to assume and control its defense in the Delaware Federal Action via counsel for Plaintiff—the only counsel offered by Plaintiff and the refusal of which prompted counsel for Plaintiff to improperly claim that Defendant Beacon was in breach of the SPA. Defendants further deny that Defendants breached the SPA. Defendants admit that counsel for Defendants refused to allow Plaintiff to assume and control BIH's defense in the Delaware Federal Action, as doing so presented two conflicts: (1) counsel for Plaintiff could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH, making it improper for Plaintiff—via his counsel or otherwise—to

assume and control the defense of Defendant BIH.  Defendants deny all remaining allegations in Paragraph 119 of the Amended Complaint.

120.    The allegations contained in Paragraph 120 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document and further denies that Plaintiff had the right to assume and control Defendant BIH's defense in the Delaware Federal Action via Plaintiff's counsel.  Defendants deny all remaining allegations in Paragraph 120 of the Amended Complaint.

121.    Defendants admit the allegations in Paragraph 121 of the Amended Complaint.

**IX.    Potter Seeks to Enter into Joint Defense Agreement with BIH in the Delaware District Court Action; BIH Declines**

122.    The allegations in Paragraph 122 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant BIH was required to permit Plaintiff to participate in Defendant BIH's defense in the Delaware Federal action because doing so presented two conflicts: (1) counsel for Plaintiff could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH, making it improper for Plaintiff—via his counsel or otherwise—to participate in the defense of Defendant BIH.

123.    The allegations in Paragraph 123 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further note that Plaintiff has not acted in good faith because Plaintiff attempted to assume and control and participate in the defense of Defendant BIH in the Delaware Federal Action when doing so presented two conflicts: (1) counsel for Plaintiff could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH.

124.    The allegations in Paragraph 124 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant BIH was required to enter into a joint defense agreement with Plaintiff's counsel because: (1) counsel for plaintiff offered such joint defense agreement via counsel for plaintiff, which could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH, making it improper for Plaintiff—via his counsel or otherwise—to enter into a joint defense agreement with Defendant BIH.

125.    Defendants deny that Defendant BIH was required to enter into a joint defense agreement with Plaintiff's counsel because: (1) counsel for Plaintiff offered such joint defense

agreement via counsel for Plaintiff, which could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH, making it improper for Plaintiff—via his counsel or otherwise—to enter into a joint defense agreement with Defendant BIH.

126.     Defendants deny that Defendant BIH was required to enter into a joint defense agreement with Plaintiff's counsel because: (1) counsel for Plaintiff offered such joint defense agreement via counsel for Plaintiff, which could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware Federal Action diverged from those of Defendant BIH, making it improper for Plaintiff—via his counsel or otherwise—to enter into a joint defense agreement with Defendant BIH.  Defendants further state they are without knowledge or information sufficient to admit the allegations in Paragraph 126 of the Amended Complaint and, therefore, Defendants deny the allegations.

127.     Defendants admit that Defendant BIH refused Plaintiff's request to enter into a joint defense agreement with Plaintiff in connection with the Delaware Federal Action.  Defendants further note that Defendant BIH was required to enter into a joint defense agreement with Plaintiff's counsel because: (1) counsel for Plaintiff offered such joint defense agreement via counsel for Plaintiff, which could not permissibly represent Defendant BIH while concurrently filing suit and obtaining a default judgment in the Delaware State Action due to a non-waivable conflict under attorney rules for professional conduct; and (2) Plaintiff's interests in the Delaware

Federal Action diverged from those of Defendant BIH, making it improper for Plaintiff—via his counsel or otherwise—to enter into a joint defense agreement with Defendant BIH.

## X.     The Delaware State Court Action is Dismissed Without Prejudice

128.    Defendants admit the allegations in Paragraph 128 of the Amended Complaint.

129.    Defendants deny that Defendant Beacon was lawfully served with process through its Delaware registered agent.  Defendants further deny that Defendant Beacon had notice of the Delaware State Action Complaint or Plaintiff's default judgment in the Delaware State Action before June 9, 2020 and admit taking a consistent position in its Motion to Set Aside Default in the Delaware State Action.

130.    Defendants admit the allegations in Paragraph 130 of the Amended Complaint.

131.    Defendants admit the allegations in Paragraph 131 of the Amended Complaint, except deny the date of the hearing—it occurred on July 17, not July 7, 2020.  Defendants note that Judge LeGrow of the Delaware Superior Court vacated the default after finding "extraordinary circumstances" existed for doing so, pointing to Plaintiff and his counsel's improper conduct. Among other things, the Court found it would vacate the default "solely on the fact that Mr. Potter, represented by counsel, was aware that the defendants were disputing the debt [at issue in the Delaware State Action]; was aware that the [D]efendants were represented by counsel relating to that very dispute; filed the complaint [in the Delaware State Action]; entered the direction for entry of default judgment; and never once provided a courtesy copy of th[e] [Delaware State Action] complaint or the default judgment, once it was obtained, to counsel."  (Transcript of July 17 Hearing at 60:12-21.)  The Court went further to note, however, that "what makes this a particularly troubling case and what makes me more than confident that Rule 60(b)(6) [permitting the court "a grand reservoir of equitable power to do justice in a particular case"] is the appropriate relief here is what happened thereafter" and "that, specifically, is that with default judgment in

hand, Mr. Potter's counsel then sought to represent Beacon's subsidiary, BIH, in separate but related litigation without disclosing the existence of the conflict. And, to me, it is a very clear conflict under Rule 1.7 of the Rules of Professional Conduct." (*Id.*, 61:12-23.) The Court went further in justifying vacating the default and admonishing Plaintiff's counsel by stating "then to compound the error, Potter now contends that the defendants in this action, the Acuntos and Beacon's refusal of that representation, when there was a very clear conflict of interest that would prevent the representation absent an informed consent in writing, under rule 1.7, Potter now contends that the refusal amounts to a breach of the SPA and **has so argued in the Southern District of New York**. So, at best, this is a breakdown in communication between counsel. At best. I think it's something much less unintentional than that. Or, to avoid the double negative, **much more intentional than that**, and so this Court is not going to be a tool by which parties or their counsel try to gain a leg up in other litigation or try to mask what is going on for purposes of achieving something in other related disputes." (*Id.*, 62:3-23.)

132.    Defendants admit the allegations in Paragraph 132 of the Amended Complaint. Defendants note that Plaintiff's voluntary dismissal came on the very next business day after he and his counsel were admonished by Judge LeGrow for their improper conduct.

## XI.    BIH Moves to Dismiss the Amended Complaint Filed in the Delaware District Court Action; Potter Files a Response in Support of that Motion

133.    Defendants admit the allegations in Paragraph 133 of the Amended Complaint and note that Plaintiff's characterization aside, Defendant BIH's Motion to Dismiss speaks for itself.

134.    Defendants admit that Plaintiff filed a response in support of Defendant BIH's motion to dismiss the claims against BIH in the Delaware Federal Action, but deny that BIH's interests are in any way aligned with Plaintiff's in the Delaware Federal Action, believe that his joinder and endorsement was orchestrated to bolster his position that Plaintiff should have been

permitted to assume and control the defense of BIH in the Delaware Federal Action despite having created a non-waivable conflict and despite having defrauded the Acuntos and Beacon in the course of the sale of BIH.

**XII.   Defendants Demand Indemnification in the Delaware District Court Action and this New York District Court Action**

135.    The allegations in Paragraph 135 of the Amended Complaint cite to and purport to rely on an August 4, 2020 letter from the undersigned to counsel for Plaintiff, attached hereto as **Exhibit 13**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the August 4, 2020 letter.

136.    The allegations in Paragraph 136 of the Amended Complaint cite to and purport to rely on an August 4, 2020 letter from the undersigned to counsel for Plaintiff, attached hereto as **Exhibit 13**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the August 4, 2020 letter.

137.    Defendants admit that Plaintiff sent the correspondence cited in Paragraph 137 of the Amended Complaint.  Defendants deny that Plaintiff has no duty to indemnify Beacon or BIH in this action or the Delaware Federal Action.

138.    The allegations in Paragraph 138 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further denies that Plaintiff had the right to assume and control Defendant BIH's defense in the Delaware Federal Action via Plaintiff's counsel.  Defendants admit that that Plaintiff sent the correspondence cited in Paragraph

137 of the Amended Complaint.  Defendants deny that Plaintiff has no duty to indemnify Beacon or BIH in this action or the Delaware Federal Action.

139.     The allegations contained in Paragraph 139 of the Amended Complaint purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document.  Defendants deny all remaining allegations in Paragraph 139 of the Amended Complaint.

140.     The allegations in Paragraph 140 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant Beacon breached the SPA or has any obligation to indemnify Plaintiff in this action.  Defendants deny all remaining allegations in Paragraph 140 of the Amended Complaint.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (Against Beacon)

141.     Defendants incorporate and re-allege their responses in Paragraphs 1 through 140 above, as if fully set forth herein.

142.     The allegations in Paragraph 142 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

143.     The allegations in Paragraph 143 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is

required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant Beacon breached the SPA or has any obligation to indemnify Plaintiff in this action.  Defendants deny all remaining allegations in Paragraph 643 of the Amended Complaint.

144.    The allegations in Paragraph 144 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 144 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 144 of the Amended Complaint.

145.    The allegations in Paragraph 145 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants further deny the allegations in Paragraph 145 of the Amended Complaint because Beacon does now owe Plaintiff compensation under the Final Payment because Plaintiff failed to satisfy conditions precedent to the Final Payment.  Defendants deny all remaining allegations in Paragraph 145 of the Amended Complaint.

146.    Defendants deny that transactions during the last six months of 2019 reflected in Defendant BIH's financial records provided or made available by Potter accurately reflected revenue to Defendant BIH.  Defendants further deny that Plaintiff satisfied the conditions

precedent on which the Final Payment was subject to according to the SPA.  Defendants deny all remaining allegations in Paragraph 146 of the Amended Complaint.

147.    Defendants deny that transactions during July and August 2019 reflected in Defendant BIH's financial records provided or made available by Potter accurately reflected revenue to Defendant BIH.  Defendants further deny that Plaintiff satisfied the conditions precedent on which the Final Payment was subject to according to the SPA.  Defendants deny all remaining allegations in Paragraph 147 of the Amended Complaint.

148.    Defendants admit the allegations in Paragraph 148 of the Amended Complaint.  Defendants deny that Plaintiff satisfied the conditions precedent on which the Final Payment was subject to according to the SPA.  Defendants deny all remaining allegations in Paragraph 148 of the Amended Complaint.

149.    The allegations in Paragraph 149 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 149 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 149 of the Amended Complaint.

150.    Defendants deny the allegations in Paragraph 150 of the Amended Complaint.

151.    The allegations in Paragraph 151 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 151 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which

no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 151 of the Amended Complaint.

152.    The allegations in Paragraph 152 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 152 of the Amended Complaint.

153.    Defendants admit that Plaintiff submitted an initial request for reimbursement of medical requests to Carole Acunto.  Defendants deny that Plaintiff was entitled to such reimbursement under the terms of the SPA.  Defendants admit that Carole Acunto is an officer of Defendant Beacon.  Defendants deny all remaining allegations in Paragraph 153 of the Amended Complaint.

154.    The allegations in Paragraph 154 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny that Plaintiff was entitled to such reimbursement under the terms of the SPA.

155.    The allegations in Paragraph 155 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

**COUNT II**
**BREACH OF CONTRACT**
**(Against BIH)**

156.    Defendants incorporate and re-allege their responses in Paragraphs 1 through 155 above, as if fully set forth herein.

157.    The allegations in Paragraph 157 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

158.    The allegations in Paragraph 158 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 158 of the Amended Complaint.

159.    Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 159 of the Amended Complaint and, therefore, Defendants deny the allegations.

160.    The allegations in Paragraph 160 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and Defendants further deny that Plaintiff performed his obligations under the SPA.  Defendants deny all remaining allegations in Paragraph 160 of the Amended Complaint.

161.    The allegations in Paragraph 161 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they

are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants admit that Plaintiff e-mailed Carole Acunto on December 30, 2019 regarding Plaintiff's healthcare benefits.  Defendants deny all remaining allegations in Paragraph 161 of the Amended Complaint.

162.    The allegations in Paragraph 162 of the Amended Complaint cite to and purport to rely on a written communication, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the communication.  Defendants deny that Plaintiff was entitled to reimbursement of medical benefits under the terms of the SPA.

163.    Defendants admit that Plaintiff registered for health insurance under Defendant BIH's medical plan.  Defendants deny that Plaintiff was entitled to reimbursement of such benefits under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 163 of the Amended Complaint.

164.    Defendants admit that Plaintiff was provided medical benefits under BIH's medical plan.  Defendants deny that Plaintiff is entitled to reimbursement for medical benefits under the terms of the SPA.

165.    Defendants admit that Plaintiff submitted a request for reimbursement of medical requests to Carole Acunto.  Defendants deny that Plaintiff was entitled to such reimbursement under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 165 of the Amended Complaint.

166.    The allegations in Paragraph 166 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 166 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which

no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant BIH breached the SPA. Defendants deny all remaining allegations in Paragraph 166 of the Amended Complaint.

167. The allegations in Paragraph 167 of the Amended Complaint set forth a legal conclusion to which no response in required. To the extent a response is required, Defendants deny such legal conclusion. The allegations in Paragraph 167 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant Beacon breached the SPA. Defendants deny all remaining allegations in Paragraph 167 of the Amended Complaint.

168. The allegations in Paragraph 168 of the Amended Complaint set forth a legal conclusion to which no response in required. To the extent a response is required, Defendants deny such legal conclusion. The allegations in Paragraph 168 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant Beacon breached the SPA. Defendants admit that Defendant Beacon is a separate legal entity from Defendant BIH. Defendants deny all remaining allegations in Paragraph 168 of the Amended Complaint.

169. The allegations in Paragraph 169 of the Amended Complaint set forth a legal conclusion to which no response in required. To the extent a response is required, Defendants

deny such legal conclusion.  The allegations in Paragraph 169 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 169 of the Amended Complaint.

170.    The allegations in Paragraph 170 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

171.    Defendants admit that Beacon acquired BIH.  Defendants deny all remaining allegations in Paragraph 171 of the Amended Complaint.

172.    Defendants admit the Acuntos are shareholders of Beacon, a lawfully formed corporation under the laws of Delaware.  Defendants further admit that BIH, a lawfully formed corporation under the laws of Florida, is a wholly owned subsidiary of Beacon.  Defendants deny all remaining allegations in Paragraph 172 of the Amended Complaint.

173.    Defendants admit that Mr. Acunto is a shareholder and officer of Beacon, a lawfully formed corporation under the laws of Delaware.  Defendants admit that Ms. Acunto is an officer of Beacon.  Defendants further admit that BIH, a lawfully formed corporation under the laws of Florida, is a wholly owned subsidiary of Beacon.  Defendants deny all remaining allegations in Paragraph 173 of the Amended Complaint.

174.    Defendants admit the Acuntos are officers of Beacon, a lawfully formed corporation under the laws of Delaware.

175.    Defendants admit the Acuntos are officers of BIH, a lawfully formed corporation under the laws of Florida.

176.    The allegations in Paragraph 176 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny the allegations in Paragraph 176 of the Amended Complaint.  BIH and Beacon are lawfully formed, separate corporations and have always adhered to all corporate formalities.

177.    The allegations in Paragraph 177 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny the allegations in Paragraph 177 of the Amended Complaint.  BIH and Beacon are lawfully formed, separate corporations and have always adhered to all corporate formalities.

178.    The allegations in Paragraph 178 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny the allegations in Paragraph 178 of the Amended Complaint.  BIH and Beacon are lawfully formed, separate corporations and have always adhered to all corporate formalities.

179.    Defendants deny the allegations in Paragraph 179 of the Amended Complaint.

180.    Defendants admit the allegations Paragraph 180 of the Amended Complaint.

181.    Defendants deny the allegations in Paragraph 181 of the Amended Complaint.

182.    The allegations in Paragraph 182 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant Beacon has evaded its obligations to Plaintiff under the SPA.  Defendants deny all remaining allegations in Paragraph 182 of the Amended Complaint.

183.    The allegations in Paragraph 183 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants

deny such legal conclusion.  The allegations in Paragraph 183 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Beacon breached the SPA and deny that Potter had suffered damages as a result.  Defendants deny all remaining allegations in Paragraph 183 of the Amended Complaint.

184.    The allegations in Paragraph 184 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

185.    The allegations in Paragraph 185 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 185 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Beacon breached the SPA and deny that Potter suffered damages as a result.  Defendants deny all remaining allegations in Paragraph 185 of the Amended Complaint.

## COUNT III
## DECLARATORY RELIEF
### (Against Beacon and BIH)

186.    Defendants incorporate and re-allege their responses in Paragraphs 1 through 185 above, as if fully set forth herein.

187.    The allegations in Paragraph 187 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants are

without knowledge or information sufficient to admit the allegations in Paragraph 187 of the Amended Complaint and, therefore, Defendants deny the allegations.

188.    Defendants are without knowledge or information sufficient to admit the allegations in Paragraph 188 of the Amended Complaint and, therefore, Defendants deny the allegations.

189.    The allegations contained in Paragraph 189 of the Amended Complaint cite to and purport to rely on two documents—the SPA, attached hereto as **Exhibit 1**, and an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speak for themselves and to which no response in required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize these documents and further deny that Plaintiff had the right to assume and control Defendant BIH's defense in the Delaware Federal Action via Plaintiff's counsel.  Defendants deny all remaining allegations in Paragraph 189 of the Amended Complaint.

190.    The allegations contained in Paragraph 190 of the Amended Complaint cite to and purport to rely on two documents—the SPA, attached hereto as **Exhibit 1**, and an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speak for themselves and to which no response in required. To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize these documents and further denies that Plaintiff had the right to assume and control Defendant BIH's defense in the Delaware Federal Action via Plaintiff's counsel.  Defendants deny all remaining allegations in Paragraph 190 of the Amended Complaint.

191.    The allegations in Paragraph 191 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 191 of the Amended Complaint.

192.    The allegations contained in Paragraph 192 of the Amended Complaint cite to and purport to rely on two documents—the SPA, attached hereto as **Exhibit 1**, and counsel for BIH's letter to counsel for Plaintiff, dated August 4, 2020, attached hereto as **Exhibit 13**, which speak for themselves and to which no response in required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize these documents.  Defendants deny all remaining allegations in Paragraph 192 of the Amended Complaint.

193.    The allegations in Paragraph 193 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 193 of the Amended Complaint.

194.    The allegations in Paragraph 194 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 194 of the Amended Complaint.

195.    The allegations contained in Paragraph 195 of the Amended Complaint cite to and purport to rely on an e-mail chain between counsel for Defendants and counsel for Plaintiff, dated April 9, 2020 to April 15, 2020, attached hereto as **Exhibit 10**, which speaks for itself and to which no response in required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize this document.  Defendants deny all remaining allegations in Paragraph 195 of the Amended Complaint.

196.    The allegations contained in Paragraph 196 of the Amended Complaint cite to and purport to rely on two documents—the SPA, attached hereto as **Exhibit 1**, and counsel for BIH's letter to counsel for Plaintiff, dated August 4, 2020, attached hereto as **Exhibit 13**, which speak for themselves and to which no response in required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize these documents and further deny that Defendant BIH took action contrary to the SPA and deny that Defendant BIH was required to enter into a joint defense agreement with Plaintiff in the Delaware Federal Action.  Defendants deny all remaining allegations in Paragraph 196 of the Amended Complaint.

197.    The allegations in Paragraph 197 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 197 of the Amended Complaint.

198.    The allegations in Paragraph 198 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they

are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 198 of the Amended Complaint.

199.    Defendants deny the allegations contained in Paragraph 199 of the Amended Complaint.

200.    The allegations in Paragraph 200 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 200 of the Amended Complaint.

201.    The allegations in Paragraph 201 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.  The allegations in Paragraph 201 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 201 of the Amended Complaint.

202.    The allegations contained in Paragraph 202 of the Amended Complaint cite to and purport to rely on two documents—the SPA, attached hereto as **Exhibit 1**, and counsel for BIH's letter to counsel for Plaintiff, dated August 4, 2020, attached hereto as **Exhibit 13**, which speak for themselves and to which no response in required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize these documents and further deny that Defendants breached the SPA.  Defendants deny all remaining allegations in Paragraph 202 of the Amended Complaint.

203.    The allegations in Paragraph 203 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 203 of the Amended Complaint.

### COUNT IV
### UNJUST ENRICHMENT
### (Against BIH in the Alternative)

204.    Defendants incorporate and re-allege their responses in Paragraphs 1 through 203 above, as if fully set forth herein.

205.    The allegations in Paragraph 205 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

206.    The allegations in Paragraph 206 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

207.    The allegations in Paragraph 207 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

208.    The allegations in Paragraph 208 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

209.    The allegations in Paragraph 209 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they

are inconsistent with, paraphrase, or re-characterize the SPA and further deny that Defendant Beacon owes Plaintiff any payment under the SPA.  Defendants deny all remaining allegations in Paragraph 209 of the Amended Complaint.

210.    Defendants deny the allegations in Paragraph 210 of the Amended Complaint.

211.    Defendants deny the allegations in Paragraph 211 of the Amended Complaint.

212.    Defendants deny the allegations contained in Paragraph 212 of the Amended Complaint.

213.    The allegations in Paragraph 213 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

214.    The allegations in Paragraph 214 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

215.    The allegations in Paragraph 215 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

216.    The allegations in Paragraph 216 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

217.    The allegations in Paragraph 217 of the Amended Complaint cite to and purport to rely on the SPA, attached hereto as **Exhibit 1**, which speaks for itself and to which no response is required.  To the extent a response is required, Defendants deny the allegations to the extent they

are inconsistent with, paraphrase, or re-characterize the SPA.  Defendants deny all remaining allegations in Paragraph 217 of the Amended Complaint.

218.    Defendants admit that Plaintiff was eligible for medical benefits under BIH's medical plan.  Defendants deny that Plaintiff is entitled to reimbursement for medical benefits under the terms of the SPA.

219.    Defendants admit that Plaintiff registered for medical benefits under BIH's medical plan.  Defendants deny that Plaintiff is entitled to reimbursement for medical benefits under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 219 of the Amended Complaint.

220.    Defendants admit that Plaintiff submitted a request for reimbursement of medical requests to Carole Acunto.  Defendants deny that Plaintiff was entitled to such reimbursement under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 220 of the Amended Complaint.

221.    Defendants admit that Plaintiff submitted a request for reimbursement of medical requests to Carole Acunto.  Defendants deny that Plaintiff was entitled to such reimbursement under the terms of the SPA.  Defendants deny all remaining allegations in Paragraph 221 of the Amended Complaint.

222.    Defendants deny that Plaintiff was entitled to reimbursement of medical expenses under the terms of the SPA.

223.    The allegations in Paragraph 223 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

224.    The allegations in Paragraph 224 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

225.    The allegations in Paragraph 225 of the Amended Complaint set forth a legal conclusion to which no response in required.  To the extent a response is required, Defendants deny such legal conclusion.

## PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any judgment or relief, whether monetary, equitable or otherwise, including that requested in subparts (1) through (9) of the "WHEREFORE" clause following Paragraph 225 of the Amended Complaint.

## GENERAL DENIAL

All allegations of the Amended Complaint not admitted, denied, or explained in this Third Amended Answer are here and now denied as fully as is specifically set forth and denied.

## AFFIRMATIVE DEFENSES

Defendants do not knowingly or intentionally waive any applicable defense and reserve the right to assert and rely on such other applicable defenses as may become available or apparent during the course of the proceedings.

Defendants further reserve the right to amend their Third Amended Answer and/or defenses accordingly, and/or delete defenses that they determine are not applicable, during the course of the proceedings.  Without assuming any burdens that they would not otherwise bear, Defendants assert the following defenses:

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

The Amended Complaint fails, in whole or in part, to state a claim upon which relief may be granted or for which the relief or recovery sought can be awarded to Plaintiff.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, as a result of Plaintiff's own fraud, breach of contract, misrepresentations, bad faith, and/or other misconduct.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants did not breach the SPA.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

Defendants at all times acted reasonably and in good faith in performing any obligations under the SPA.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations and/or by equitable doctrines of laches, unclean hands, waiver and estoppel.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any injury or damages.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff suffered any damages, which damages are denied, any such damages are barred and/or must be reduced on account of Plaintiff's failure to take reasonable steps to mitigate damages.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because the relief requested in the Amended Complaint would constitute unjust enrichment to Plaintiff.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because Plaintiff fraudulently induced Defendant Beacon into executing the SPA.  Plaintiff made intentional, material misrepresentations and omissions to the Acuntos during their due diligence of BIH.  Plaintiff specifically made misrepresentations and omissions concerning BIH's finances as well as contracts and litigation relating to BIH.  Each misrepresentation and omission induced Beacon into executing the SPA.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because Plaintiff negligently misrepresented to the Acuntos materials facts concerning BIH during the due diligence that preceding execution of the SPA.  Plaintiff specifically made misrepresentations and omissions concerning BIH's finances as well as contracts and litigation relating to BIH.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because Plaintiff breached express representations and warranties in Sections 3.06 and 3.09 of the SPA and the SPA as a whole.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because Plaintiff failed to satisfy conditions precedent in the SPA.  Plaintiff specifically failed to satisfy conditions precedent in Section 1.02 of the SPA concerning BIH revenue thresholds.  Plaintiff also failed to satisfy conditions precedent in Section 1.02A of the SPA concerning bookkeeping, accounting, and reconciliation.  Defendants did not incur a duty to make either final or reconciliation payments to Plaintiff because he failed to satisfy those conditions precedent.

**WHEREFORE**, Defendants respectfully request that the Court:

A.     Dismiss the Amended Complaint in its entirety with prejudice;

B.      Deny each and every demand and prayer for relief contained in the Amended Complaint;

C.      Award Defendants their costs and reasonable attorneys' fees; and

D.      Award Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS OF BEACON INTERCONTINENTAL, INC. AND BUSINESS INSURANCE HOLDINGS, INC.

Defendants and Counterclaim Plaintiffs, Beacon Intercontinental Group, Inc. ("Beacon") and Business Insurance Holdings, Inc. ("BIH" or the "Company") (together "Defendants"), for their counterclaims ("Third Amended Counterclaims") against Plaintiff and Counterclaim Defendant Adam Potter ("Potter") state as follows:

### JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

2.      This Court has personal jurisdiction over Potter because the SPA contains a choice of law and forum selection clause whereby the parties expressly agree that any disputes arising out of the SPA must be brought in state or federal court in Manhattan, New York.  Moreover, Potter has, by bringing the above-captioned lawsuit against Beacon and BIH, subjected himself to the jurisdiction of this Court.  Accordingly, venue is also proper in this Court.

### GENERAL ALLEGATIONS

I.      **Potter's Formation and Ownership of BIH**

3.      BIH was formed by Potter.

4.      BIH's predecessor entity was C&E MGMT & Planning, Inc. ("C&E"), a Florida corporation in which Potter owned 100% of the issued and outstanding capital stock of C&E until on or about June 1, 2018.

5.      On or about June 1, 2018, Potter and several entities he owned,[2] including C&E, entered into an Asset Purchase Agreement with The American Institute for Chartered Property Casualty Underwriters and its wholly-owned subsidiary, The Institutes, LLC (collectively, "the Institutes").

6.      Upon information and belief, at the time of the Asset Purchase Agreement ("the Institutes Contract"), C&E was engaged in the business of identifying and securing conference and event locations, hotel contracts, and outside locations.

7.      The Institutes paid Potter nearly $20 million in exchange for all of the assets of C&E and several of Potter's other entities under the Institutes Contract.

8.      The Institutes Contract contained a covenant not to compete clause that prohibited, for a period of five (5) years after execution of the agreement, Potter and C&E from engaging in certain activities that would compete with the business lines acquired by the Institutes ("Non-Compete") through the Institutes Contract.

9.      On or about June 7, 2018, Potter changed C&E's name to Business Insurance Holdings, Inc.

10.     Potter also owned Business Insurance Holdings, LLC ("BIH, LLC").  On or about June 7, 2018, Potter changed the name of BIH, LLC to PBIH, LLC, a Florida limited liability company.

---

[2] The other entities owned directly or indirectly by Potter that were part of the Asset Purchase Agreement included CLM Group, Inc., a Florida corporation, Claims Pages, LLC, a Florida LLC, and Moxie HC, LLC, a Florida LLC.

## II.   **Potter and the Acuntos Negotiate the Sale of BIH**

11.    In or about June 2019, Potter began discussions with one of Beacon's owners, Steve Acunto, for the sale of BIH.

12.    BIH is an insurance trade publication that covers various segments of the business of risk transfer, including news and opinion affecting insurance carriers, reinsurers, legal, and insurtech enterprises; regulatory, legislative and court decisions; insurer results and trends; and insurance professionals themselves.  BIH also operated conferences concerning a wide range of risk transfer matters.

13.    Potter explained to the Acuntos that, under his ownership, BIH was a profitable insurance trade publication that, among other services, operated and coordinated conferences for insurance industry professionals that provided educational and informational resources concerning a wide range of risk-management issues.  Potter inquired as to whether the Acuntos might be interested in purchasing BIH.

14.    The Acuntos inquired as to Potter's proposed sales price for BIH.  Potter responded that his sales price for BIH was $5 million.

15.    The Acuntos inquired as to the basis for Potter's calculation of the sales price. Potter explained the $5 million sales price was based on the Company's historical financial performance and, in particular, five (5) times the 2018 earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $1 million.

16.    The Acuntos expressed interest in first reviewing BIH's financial records in deciding whether to proceed with the purchase of BIH and, if so, at what price.

### III.   **Potter Misrepresents BIH's Historical Financial Performance**

17.     On or about June 13, 2019, Steve Acunto requested that Potter provide financial information concerning BIH.   Steve Acunto explained that, after review of the financial information, he would consider whether to prepare a letter of intent.

18.     On or about June 13, 2019, Potter e-mailed Steve Acunto documents that purported to show BIH's historical financial performance, including income statements (i.e., profit and loss statements) for calendar years 2017 and 2018,[3] as reflected in **Table 1** below:

**BIH's Income Statements Provided by Mr. Potter**

|  | 2017 | % of Sales | 2018 | % of Sales |
|---|---|---|---|---|
| Revenue | $  4,379,507 | 100.0% | $  4,935,248 | 100.0% |
| Cost of Good Sold | $     726,330 | 17% | $     376,563 | 8% |
| Gross Profit | $  3,653,177 | 83.4% | $  4,558,685 | 92.4% |
| Fixed Expenses | 3,670,221 | 83.8% | 3,505,802 | 71.0% |
| Other Income | - | 0.0% | - | 0.0% |
| **EBITDA** | $     (17,045) | -0.4% | $  1,052,882 | 21.3% |
| Depreciation Expense | $       10,155 | 0.2% | $              - | 0.0% |
| **Net Income** | $     (27,200) | -0.6% | $  1,052,882 | 21.3% |

19.     The figures Potter provided to Steve Acunto on or about June 13, 2019 grossly overstated and materially misrepresented BIH's revenue, EBITDA, and net income.

20.     According to calendar year end "income statements" provided by Potter, from 2017 to 2018, BIH's revenues increased slightly from $4.379 million to $4.935 million.

21.     According to this same information provided by Potter, in 2017 BIH generated negative EBITDA totaling <$17,045>.  Potter represented, however, that in 2018, BIH's EBITDA increased to $1.052 million.

---

[3] E-mail dated June 13, 2019, from Adam Potter to Steve Acunto, subject: PPPPPPPPPP ADAM / STEVE A., attaching BI P&L 1-1-17 to 12-31.17[2].pdf. BIH, Inc - P&L (2018).pdf. BIH, LLC - P&L (Jan 1 – Jun 30, 2018).pdf.

22.     In his June 13, 2019 e-mail, Potter expressed his understanding and desire that Steve Acunto would utilize these financial figures in the valuation and due diligence of BIH.

23.     The foregoing financial performance data is unsupported by accounting records concerning BIH that Potter maintained on the accounting software QuickBooks (the "QuickBooks Accounting Records"), which were not provided by Potter prior to the sale and only produced after multiple demands by the Acuntos following the sale.  The income statements prepared and provided by Potter were false and misrepresented the true financial performance of BIH during the relevant time period, as reflected in **Table 2** below:

**BIH's Financial Performance**

|  | 2017 | % of Sales | 2018 | % of Sales |
|---|---|---|---|---|
| Revenue | $   5,033,517 | 100.0% | $   3,744,526 | 100.0% |
| Cost of Goods Sold |  |  |  |  |
| Conferences / Events | $        - | 0.0% | $        - | 0.0% |
| AV Expense | 77,372 | 1.5% | 105,290 | 2.8% |
| Commissions | 310,000 | 6.2% | 4,778 | 0.1% |
| Continuing Ed Credits | 2,605 | 0.1% | 5,732 | 0.2% |
| Facility | 2,398,257 | 47.6% | 952,282 | 25.4% |
| Miscellaneous | 7,563 | 0.2% | 3,791 | 0.1% |
| Outside Service | 31,380 | 0.6% | 52,276 | 1.4% |
| Printing | 78,530 | 1.6% | 29,001 | 0.8% |
| Registration Materials / Supplies | 126,743 | 2.5% | 68,722 | 1.8% |
| Royalty Expense | 150,000 | 3.0% | 2,010,993 | 53.7% |
| Total Cost of Goods Sold | $   3,182,450 | 63.2% | $   3,232,865 | 86.3% |
| Gross Profit | $   1,851,066 | 36.8% | $      511,661 | 13.7% |
| Fixed Expenses | 726,158 | 14.4% | 1,945,826 | 52.0% |
| Other Income | - | 0.0% | 50,000 | 1.3% |
| **EBITDA** | $   1,124,908 | 22.3% | $ (1,384,165) | -37.0% |
| Depreciation Expense | $        196 | 0.0% | $        293 | 0.0% |
| **Net Income** | $   1,124,712 | 22.3% | $ (1,384,458) | -37.0% |

24.     Based on the Company's QuickBooks Accounting Records, which were not provided by Potter prior to the sale and only produced after multiple demands by the Acuntos following the sale, 2017 revenues at calendar year end were $5.033 million, not $4.379 million as

Potter represented.  More importantly, however, the actual 2018 revenues at calendar year end were $3.744 million, not $4.935 million as Potter previously represented—a negative differential of $1.191 million.

25.      Based on these same QuickBooks Accounting Records, at calendar year end 2017, BIH generated EBITDA totaling $1.1 million, not <$17,045> as Potter represented, while at calendar year end 2018, BIH generated negative EBITDA totaling <$1.384 million>, not $1.052 million as Potter previously represented—*a negative differential of $2.437 million*.

26.      Based on these same QuickBooks Accounting Records, at calendar year end 2017, BIH generated net income totaling $1.124 million, not <$27,200> as Potter represented, while at calendar year end 2018, BIH generated negative net income (i.e., losses) of <$1.384 million>, not $1.052 million as Potter previously represented—*a negative differential of $2.437 million*.

27.      Significantly, the negotiated $5.0 million sales price Potter calculated was based on an agreed upon multiple of five (5) times BIH's 2018 EBITDA.  Because Potter's presentation of the 2018 EBITDA was significantly and materially overstated by $2.437 million and unsupported by the accounting evidence, the sales price was also significantly and materially overstated.

28.      The timing interval of the calculations—a calendar year basis—is not the reason for any discrepancy and material overstatement.  Potter falsified the financial performance data for BIH.  The data reveals the same negative differentials when examining the financial performance data on a fiscal year end ("FYE") basis, that is July 1–June 30.

29.      On or about July 18, 2019, Potter provided Steve Acunto with BIH's purported FYE 2019 income statement outlining the Company's revenue, gross profit, fixed expenses, and

EBITDA for the period July 1, 2018 through June 30, 2019.  Potter's income statement reflected

EBITDA and net income of $27,289, [4] as reflected in **Table 3** below.

**BIH's Income Statements Provided by Mr. Potter**

|  | FYE 2019 | % of Sales |
|---|---|---|
| Revenue | $ 5,251,066 | 100.0% |
| Cost of Good Sold | $ 1,681,207 | 32% |
| Gross Profit | $ 3,569,860 | 68.0% |
| Fixed Expenses | 3,542,570 | 67.5% |
| Other Income | - | 0.0% |
| **EBITDA** | $ 27,290 | 0.5% |
| Depreciation Expense | $ - | 0.0% |
| **Net Income** | $ 27,290 | 0.5% |

30.     According to the Company's QuickBooks Accounting Records, which were not

provided by Potter prior to the sale and only produced after multiple demands by the Acuntos

following the sale, at FYE 2019 (June 30, 2019), BIH generated net income totaling a mere $238

and EBITDA of a mere $12,527.

31.     Potter did not provide the Acuntos with access to BIH's source accounting records,

including the QuickBooks Accounting Records.  Potter represented to Steve Acunto that he, Potter,

had calculated this financial information based on entries Potter made, or directed to be made, in

BIH's QuickBooks accounting software reflecting the Company's actual business transactions.

32.     Steve Acunto understood Potter to be uniquely qualified to know the accuracy and

veracity of the due diligence materials provided by Potter because Potter was the sole owner of

BIH and managed its operations.

---

[4] Upon information and belief, in 2016, 2017 and 2018, BIH's predecessor entity C&E operated
on a calendar year fiscal running January 1 – December 31.  In or about June or July 2018, when
BIH was formed, Potter began operating it on a fiscal year running July 1 – June 30.

33.     Potter repeatedly pressured the Acuntos into completing their due diligence and finalizing the sale on an expedited basis.  In doing so, Potter repeatedly represented that he had provided all financial data relating to BIH that would enable the Acuntos to move forward with the sale.

34.     On or about August 6, 2019, Potter e-mailed Steve Acunto inquiring about the status of the draft SPA.

35.     On or about August 8, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.

36.     On or about August 15, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.

37.     On or about August 19, 2019, Potter e-mailed Steve Acunto again inquiring about the status of the draft SPA.  In this communication, Potter expressed "concern[] about finalizing the deal" noting that they had "met on August 1 and put together a game plan to move the transaction forward and close by the end of the month" and that he had still not received a draft SPA to review despite being 10-days out from closing.

38.     On or about August 30, 2019, Steve Acunto, on behalf of Beacon, e-mailed Potter concerning steps required to finalize the transaction.  Potter responded, in part, that if the sale did not close in the next few hours, he would sell BIH to another purportedly interested buyer.  Unbeknownst to the Acuntos, Potter lied; there were no other interested buyers at the time.

39.     On information and belief, Potter intentionally rushed the diligence process to conceal that he had provided the Acuntos with revenue and net income figures that did not reflect BIH's actual financial performance.

40.     The Acuntos and Potter continued negotiations concerning the purchase of BIH after Potter provided the false and fraudulent financial performance information described above. Based on Potter's misrepresentation through the falsified income statements that BIH generated nearly $1.1 million in net revenue in 2018, the parties negotiated a sales price of $5 million, based on the agreed-upon multiple of five (5) times BIH's 2018 EBITDA, as falsely represented by Potter.  Potter initially proposed this "5X" formula in a June 14, 2019 e-mail to Steve Acunto.

41.     A multiple of EBITDA is commonly used to value a company, as it approximates the net income an entity may be expected to generate over a defined period of time.  Thus, the same metric is often also used to negotiate an entity's sales price under a stock purchase or similar agreement, as Beacon and Potter did here.  The purchaser is entitled to rely on the data provided on which the EBITDA calculation is based.

42.     Only *after* executing the SPA did the Acuntos, on behalf of Beacon, discover that Potter had inflated the Company's EBITDA, net income, and revenue figures, which, in turn, inflated the purchase price to which the Acuntos, on behalf of Beacon, ultimately agreed.  But for Potter representing that BIH generated $1.1 million in net income in calendar year 2018, the Acuntos would not have positioned Beacon to purchase BIH for $5 million.

## IV.     Potter Presents the Acuntos with a Proposed Stock Purchase Agreement

43.     In August 2019, the Acuntos formed Beacon as a corporate vehicle for, among other things, acquiring BIH from Potter.

44.     Potter, as Seller, and Beacon, as Buyer, executed the SPA on September 3, 2019. A true and correct copy of the SPA is attached hereto as **Exhibit 1**.

45.     Under the SPA, Beacon acquired 100 percent of BIH's capital stock in exchange for an agreed upon purchase price of $5 million.

46.     The $5 million purchase price was based on the parties' negotiations and Potter's express representations about the Company's financial performance and, in particular, the 2018 EBITDA.

47.     Pursuant to Section 1.02 of the SPA, a payment of $4 million was due at closing. Beacon made the $4 million payment as required under the SPA.

48.     Pursuant to Section 1.02 of the SPA, a payment of an additional $1 million was subject to a condition precedent based on BIH hitting certain performance thresholds, including that BIH achieve "gross annual revenue of $5,250,000." Section 1.02 further stipulates that "the final payment of One Million Dollars ($1,000,000.00) shall be reduced dollar for dollar if [BIH's] gross revenue for the 6 months ending December 31, 2019 is not at least Two Million Dollars ($2,000,000.00) . . . ."

49.     As called for by the SPA, Beacon executed an unsecured promissory note that contained the same conditions precedent to payment. A true and correct copy of the Promissory Note is attached hereto as **Exhibit 2**.

## V.     Subject to the SPA, Beacon Discovers Potter Fraudulently Misrepresented BIH's Revenue, Net Income, and EBITDA and Misrepresented Revenue as to 10 Questionable Transactions

50.     Under the SPA, Potter was required to provide "the Books and Records of the Company" at closing, or, "for any such books and records which are not reasonably available at the Closing within thirty (30) Business Days following the Closing." (Ex. 1, § 2.02(a)(iv).)

51.     Further, Section 6.01 of the SPA requires Potter to grant Beacon, after closing and "upon reasonable prior notice, such access to financial records and other information in [his] possession" that are necessary to fulfill a "reasonable business purpose." (Ex. 1, § 6.01.)

52.     Potter failed to comply with his contractual obligations by failing to provide BIH's complete books and records, including the QuickBooks Accounting Records, at or within 30 days

after closing on the SPA or even later upon reasonable notice.  His failure was a result of his fear of Beacon learning of the massive fraud Potter had perpetrated.

53.     After executing the SPA and belatedly obtaining access to BIH's QuickBooks Accounting Records, Beacon began to see evidence that Potter had fraudulently misrepresented BIH's revenue, net income and EBITDA.  The fraudulent presentation of revenues which induced Beacon into proceeding with the purchase and agreeing to an inflated purchase price of five times BIH's purported 2018 EBITDA.

54.     Subsequent to execution of the SPA, Beacon discovered material deviations in BIH's revenue, net income, and EBITDA compared to the records Potter had previously provided during Potter's pressured and accelerated due diligence period.

55.     These deviations were discovered across the 2017, 2018, and 2019 financials, all of which had the effect of inflating the agreed-upon purchase price and inducing Beacon into proceeding with the purchase of BIH.

56.     Through further investigation and analysis, Beacon discovered that Potter directed at least ten (10), and perhaps more, substantial cash transfers into and out of BIH's accounts between August 2018 and September 2019 from other entities Potter owned or controlled, which Potter improperly and erroneously recorded as revenue to the Company.  These self-transfers amounted to Potter improperly recording $1,139,242.56 as revenue.

57.     As set forth in more detail below, the majority of the transactions represented repayment of loans or expenses to BIH and, thus, could not accurately be categorized as revenue.

58.     Each fabricated transaction, as detailed below, artificially increased BIH's purported revenues and profits as represented by Potter to Beacon.

59.     Beacon learned that, despite the income statements provided by Potter showing BIH generated *positive* $1.1 million in income in 2018, the Company generated *negative* income (i.e., losses) totaling $1.4 million, a differential of $2.4 million between what Potter had reported to Beacon (and what Beacon relied upon in agreeing to the $5 million purchase price), and what the true financial data supported.

60.     Beacon also learned that Potter had overstated 2018 EBITDA reported in the income statements, given by Potter to Beacon during due diligence, by approximately $2.4 million.

**Fraudulent Transactions One Through Six**

61.     Transactions 1 through 6 were carried out between on or about August 24, 2018 and on or about December 27, 2018 and resulted in a fraudulent inflation of BIH's revenues by $407,000.

62.     **Transaction 1**, carried out by or at Potter's direction on or about August 24, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with an entity named Moxie HC, LLC ("Moxie"),[5] a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

63.     **Transaction 2**, carried out by or at Potter's direction on or about September 6, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with

---

[5] Moxie HC, LLC is a Florida limited liability company formed by Potter.  Potter was its sole member through in or about December 2019.  Moxie owned 100% of the capital stock in CLM Group, Inc., an entity created by Potter on April 28, 2010 to provide services to property and casualty insurance claims professionals.  On June 1, 2018, Potter sold CLM Group, Inc. to The Institutes, LLC, a subsidiary of The American Institute for Chartered Property Casualty Underwriters.

Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

64.  **Transaction 3**, carried out by or at Potter's direction on or about September 27, 2018, related to an accounting entry reflecting an online transfer in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

65.  **Transaction 4**, carried out by or at Potter's direction on or about October 31, 2018, related to an accounting entry reflecting a check deposit in the amount of $75,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter. A corresponding accounting entry was improperly recorded as revenue earned to BIH.

66.  **Transaction 5**, carried out by or at Potter's direction on or about November 26, 2018, related to an accounting entry reflecting a check deposit in the amount of $50,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

67.  **Transaction 6**, carried out by or at Potter's direction on or about December 27, 2018, related to an accounting entry reflecting a check deposit in the amount of $57,000.00 into BIH checking account xx4220 controlled by Potter, from Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

68.  Potter fabricated Transactions 1 through 6 to inflate BIH's revenues and profits for fiscal year 2018.

69.  By posting these non-revenue transfers as revenue to BIH, Potter overstated BIH's revenues by $407,000 through December 31, 2018.

70.     Those transactions actually reflected Potter shuffling funds between related entities to pay for "non-recurring expenses."  Those six transactions overstated BIH 2018 EBITDA and fraudulently inflated the purchase price under the SPA.

71.     On or about December 23, 2019, months after the SPA was executed, when confronted by the Acuntos about the fraudulent transactions, Potter admitted that Transactions 1 through 6 "were transfers from Moxie and *incorrectly categorized* as Sponsorship revenue" and that "[t]he intent of the transfers were [sic] to cover non-recurring expenses, promissory notes, loans & exchange, and permitted personal expenses."[6]

72.     On or about April 14, 2020, Potter, through his counsel, reaffirmed that he had effectively misrepresented Transactions 1 through 6 as revenue in BIH's books and records when he admitted that, in fact, these entries were actually *non-revenue transfers* from Moxie to BIH.[7]

73.     Potter attempted to further mislead Beacon into believing that the fraudulent transfers reflected in Transactions 1 through 6 "did not affect net income as while there was increased revenue they offset non-recurring expenses."[8]  The "non-recurring expenses" noted by Potter—i.e., promissory notes, loans & exchange, and permitted personal expenses—are not properly income statement items.  They could not offset the misreported revenue and should have been recorded on BIH's balance sheet because, fundamentally, these were transactions between

---

[6] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 23, 2019 (emphasis added).

[7] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020 ("The revenue from these transactions was transferred from Moxie HC, a company owned by my client.  BIH was previously a member of Moxie HC and had a number of non-recurring expenses, promissory notes and personal expenses that were not attributed to the Company's operations.  The purpose of these transactions were [sic] to offset these expenses.").

[8] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.

companies controlled by Potter.  Yet, Potter failed to record these transactions on the balance sheets provided to Steve Acunto prior to consummation of the sale of BIH, resulting in his misreporting BIH's full year revenues and profits.

74.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transactions 1 through 6 overstated BIH's revenues by $407,000.

75.    Until confronted by the Acuntos, on behalf of Beacon, about the questionable Transactions 1 through 6, Potter failed to disclose the true nature and effect of recording the transfers as revenue to BIH and, in turn, inflating the revenues.

76.    Even after being confronted months after consummation of the sale of BIH about the questionable Transactions 1 through 6, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $407,000 as a result of these transactions.

77.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations concerning revenue, net income, and EBITDA in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

**Fraudulent Transaction Seven**

78.    **Transaction 7**, carried out by or at Potter's direction on or about April 26, 2019, related to an accounting entry reflecting an online transfer in the amount of $190,000.00 into BIH checking account xx4220 controlled by Potter, from checking account xx9928 associated with Moxie, a company also controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

79.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about this fraudulent transaction, Potter admitted he could not explain the transaction, other than it related to "sponsorships," which was an affirmative

misrepresentation. Potter further attempted to conceal this misrepresentation by explaining, falsely, that because "the checks were cashed and entered as cash into the account" he was unable to recall or determine which "sponsors" purportedly made these payments to BIH.[9]

80. On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 7, Potter stated, through his counsel, that he was unable to provide additional information because he "no longer has access to the bank accounts or the Company's invoice system."[10] The BIH bank account and invoice system (to which the Acuntos did not gain access until after executing the SPA) do not support how Potter recorded and characterized Transaction 7.

81. According to BIH's account statements and accounting records only made available to Beacon long after the sale and after multiple requests, Transaction 7 was an online transfer of funds to BIH from Potter's other entity, Moxie, thereby contradicting Potter's false representation that Transaction 7 reflected revenue generated from payments made by sponsors to BIH.

82. Potter misreported Transaction 7 as revenue rather than record the transfer on BIH's balance sheet as a transaction between companies owned and controlled at the time by the same individual: Potter.

83. Transaction 7 overstated BIH's revenues in calendar year 2019 by $190,000.

84. Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 7 materially overstated BIH's revenues by $190,000.

---

[9] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[10] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

85.     Until confronted by the Acuntos, on behalf of Beacon, about the questionable Transaction 7, Potter failed to disclose the true nature and effect of recording the transfer as revenue to BIH and, in turn, inflating its revenues.  He failed to notify Beacon of this error and affirmatively concealed such information.

86.     Even after being confronted months after the sale of BIH about the questionable Transaction 7, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $190,000 as a result of this transaction.

87.     The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

### Fraudulent Transaction Eight

88.     **Transaction 8**, carried out by or at Potter's direction on or about May 13, 2019, was composed of two rapid-fire transactions:  8(a) and 8(b).  Transaction 8(a) related to an accounting entry reflecting an online transfer in the amount of $99,342.56 into BIH checking account xx4220 controlled by Potter, from checking account xx1350 associated with Waggy Group, Inc. ("Waggy"), a company also owned and controlled by Potter.  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

89.     Transaction 8(b) related to an immediate withdrawal of $100,000 from BIH's checking account xx4220, and a corresponding accounting entry for a "Waggy Royalty Expense" payment totaling $100,000.

90.     On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter misrepresented the nature of Transaction 8.  Potter falsely represented that Transaction 8a, reflected in the initial May 13, 2019 entry, resulted from an unintentional deposit in BIH's bank account that he rectified

on the same day via Transaction 8b, the second entry on May 13, 2019 reflecting an outflow of $100,000 from BIH's account to Waggy's account.[11]

91.     On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 8, Potter stated, through his counsel, that Transaction 8 did not factor into Potter's calculation of BIH's revenues and profits that he represented to Beacon during the due diligence period.[12]   The explanation is utterly implausible and false.

92.     Potter's attempt to legitimize or relate Transactions 8(a) and 8(b) further reveal the fraudulent nature of the transactions.   Nothing in Potter's explanation established that Transaction 8(a) is legitimately related to Transaction 8(b) or that the latter was intended to rectify the former, particularly as the amounts in question are different.

93.     In addition, according to BIH's QuickBooks Accounting Records only made available to Beacon long after the sale and after multiple requests, Transaction 8(b) was not made against the same accounts as Transaction 8(a), that is, was not a reversal of cash and revenues, further exposing the false nature of Potter's explanation.

94.     If, as misrepresented by Potter, Transaction 8(a) was an "error," which Potter corrected on the same day with Transaction 8(b), the proper accounting treatment would have compelled Transaction 8(b) to have been recorded as a reversal of Transaction 8(a), which would have resulted in a debit to revenue and a credit to cash.   Instead, Potter falsely recorded Transaction 8 as revenue and failed to correct the improper entry.

---

[11] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[12] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

95.     Notwithstanding Potter's misrepresentations, Transaction 8 is a transfer from Waggy, a company controlled by Potter, not revenue generated by BIH.  Despite repeated requests by the Acuntos, on behalf of Beacon, Potter failed and refused to provide any accounting or other evidence supporting his assertion that Transaction 8 reflects revenue generated by BIH.  And, there is no such evidence.  Potter should have recorded Transaction 8 as an account payable liability to Waggy, not a revenue transaction.

96.     Transaction 8 overstated BIH's revenues in calendar year 2019 by $99,342.56.

97.     Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 8 materially overstated BIH's revenues by $99,342.56.  Potter failed to notify Beacon of this error and affirmatively concealed such information.

98.     Even after being confronted months after the sale of BIH about the questionable Transaction 8, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $99,342.56.

99.     Beacon reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price.

**Fraudulent Transaction Nine**

100.     **Transaction 9** was composed of two transactions: 9(a) and 9(b).  Transaction 9(a), carried out by or at Potter's direction on or about June 25, 2019, related to an accounting entry reflecting an online withdrawal in the amount of $540,000 from BIH's checking account xx4220, controlled by Potter, to Waggy, an entity also owned and controlled by Potter, identified as a "Waggy Royalty Expense" payment.

101.     Transaction 9(b), carried out by or at Potter's direction on or about July 1, 2019, related to an accounting entry reflecting an online transfer in the amount of $300,000 into BIH's

checking account xx4220, controlled by Potter, from checking account xx7090 associated with Waggy, an entity also owned and controlled by Potter. A corresponding accounting entry was improperly recorded by Potter as revenue earned to BIH and identified as "Print Media Ad Revenue."

102.   On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter misrepresented the nature of Transaction 9. Potter falsely represented that BIH initiated Transaction 9(a) in error for a "$520,000 Royalty payment," when in fact the actual payment was $540,000 (not $520,000), and that the correct transfer amount after all should have been for $220,000.

103.   Potter further falsely represented that Transaction 9(b), the purported $300,000 repayment to BIH from Waggy, was intended to reimburse BIH the net amount of the overpayment in Transaction 9(a),[13] thereby conceding that Transaction 9(b)'s $300,000 transfer was not revenue generating for BIH. Potter's purported explanation also exposed that Transaction 9(b) was not "Print Media Ad Revenue," as he had falsely represented in BIH's books and records.

104.   On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 9, Potter changed his explanation once again. He stated, through his counsel, that Transaction 9(a) constituted funds that were "transferred as a royalty payment to *Moxie*," an entity owned and controlled by Potter, not *Waggy*, another entity owned and controlled by Potter, as initially represented by Potter and as reflected in the corresponding accounting entry for this transaction.[14] This statement was false. The lies continue to accumulate.

---

[13] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.
[14] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

105.     The timing of Transactions 9(a) and 9(b) further evidences their fraudulent nature. Transaction 9(a) involved an alleged Royalty Expense overpayment in the amount of $300,000 on June 25, 2019, a mere five (5) days before BIH's 2019 fiscal year end and several weeks after Potter discussed with Steve Acunto a possible sale of BIH.  According to Potter, it was only detected and corrected on July 1, 2019, the first day of fiscal year 2020 resulting in a deposit back into BIH's account *incorrectly booked as revenue from Print Media Ad Revenue.*  This is clearly another round trip transaction timed to have the desired effect of moving money from one entity to another for the purpose of inflating gross revenues.

106.     Further, Transaction 9(b) occurred on or about July 1, 2019, the first day of the six-month period during which BIH's *gross* revenues were the key factor in determining satisfaction of the condition precedent and Potter's entitlement to the final $1 million payment under Section 1.02 of the SPA.  Potter fabricated Transaction 9(b) to intentionally overstate BIH's gross revenues. Potter's representation that Transaction 9(b) was a corrective transaction for 9(a) is not credible.  If true, Transaction 9(b) should have been booked as a reversal of Transaction 9(a), not revenue to BIH.

107.     Despite Beacon's repeated inquiries, Potter failed to provide any accounting evidence to support a legitimate relationship between Transaction 9(a)—the June 25, 2019 withdrawal of $540,000 from BIH to Waggy—and Transaction 9(b)—the July 1, 2019 transfer of $300,000 from Waggy to BIH—or why the latter was booked as revenue, or falsely identified as "Print Media Ad *Revenue*" rather than a royalty expense.  Potter materially misrepresented BIH's financial performance.

108.     Transaction 9 overstated BIH's revenues for the first two months of fiscal year 2020 by $300,000.

109.    Potter had knowledge at the time he provided the financial information to Steve Acunto in the months leading up to the sale of BIH that Transaction 9 materially overstated BIH's revenues for the first two months of fiscal year 2020 by $300,000.  He failed to notify Beacon of this error and affirmatively concealed such information.

110.    Even after being confronted months after the sale of BIH about the questionable Transaction 9, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated by $300,000.

111.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price or for calculating and agreeing upon the condition precedent terms that must be satisfied before Potter was entitled to payment of the $1 million holdback.

## Fraudulent Transaction Ten

112.    **Transaction 10**, carried out by or at Potter's direction on or about August 23, 2019, related to an accounting entry reflecting a counter check deposit in the amount of $142,900 to BIH's checking account xx4220, controlled by Potter, purportedly representing "Print Media Ad Revenue" and "Events Revenue."  A corresponding accounting entry was improperly recorded as revenue earned to BIH.

113.    On or about December 20, 2019, months after the SPA was executed, when confronted by the Acuntos, for Beacon, about the fraudulent transactions, Potter conceded the fraudulent nature of Transaction 10.  Potter explained that Transaction 10 "happened one week prior to sale and it appears was deposited into the wrong account and does not apply to BI[H]."[15]

---

[15] E-mail from Adam Potter to Steve and Carole Acunto, Re: Adam/Steve Re: Yours of Saturday/SA v2, December 20, 2019.  According to Potter, "Instead of returning the funds to the proper non-BI[H] account, had the deposit not been made, the reconciliation sheet in the 'remaining in bank account' would have been $142,900 less."

114.     On or about April 14, 2020, in furtherance of this effort to conceal and misrepresent the true nature of Transaction 10, Potter reaffirmed, through his counsel, this false narrative that "$142,900 was incorrectly deposited into the Company bank account a week prior to the sale."[16] Again, the lies continue to accumulate.  At a minimum, by Potter's and his counsel's own admission, he misreported Transaction 10 as revenue and, in turn, materially overstated BIH's revenues.

115.     Potter's explanation that Transaction 10 represents yet another six-figure "error" is not credible and unsupported by BIH's accounting records.  If Transaction 10 reflected an error in which Potter erroneously deposited $142,000 into BIH's bank account *one week before a sale was set to close*, he would have realized the mistake and corrected the "error" with a reversing entry that reflected a debit to revenue and a credit to cash.  Potter failed to do so not because of error or oversight, but because of fraud.

116.     There is no accounting evidence to support Potter's mischaracterization of Transaction 10.  Nor is there any accounting or other evidence to support Potter's incredible assertion that he mistakenly deposited $142,900 into an account belonging to an entity he was set to sell to Beacon in less than a week.  Potter knew that the Acuntos, on behalf of Beacon, would feel compelled to close on the sale given Potter's persistent pressure to do so and threats to cancel the deal, including his e-mail just four days prior to that, on August 19, 2019, in which Potter expressed "concern[] about finalizing the deal."

117.     There is no accounting evidence to support that Potter attempted to correct his purported error with a reversing entry, for one simple reason: Potter's true intent was to deposit

---

[16] Letter from Robert S. Tintner to Christopher Oprison, Re: Response to March 31, 2020 Letter Concerning Stock Purchase Agreement, April 14, 2020.

$142,900 into BIH and record this amount as revenue only one week prior to closing on the sale in order to further inflate BIH's revenues while he still had the opportunity to do so.

118.    Transaction 10 overstated BIH's revenues for the first two months of fiscal year 2020 by an additional $142,900.

119.    Transaction 10 was recorded within the six-month period during which revenues were to be used to determine Potter's final payment under the terms of the SPA.

120.    By Potter's own admission, Transaction 10, as recorded by Potter, inappropriately increased BIH's purported revenues, which, had Potter's fraud gone undetected, would have been considered in calculating Potter's $1 million final payment.

121.    Potter had knowledge in the days leading up to the sale of BIH that Transaction 10 would materially overstate BIH's revenues for the first two months of fiscal year 2020 by an additional $142,900.  He failed to notify Beacon of this overstatement and affirmatively concealed such information in order to induce the Acuntos to proceed with the purchase of BIH.

122.    Even after being confronted months after the sale of BIH about the questionable Transaction 10, Potter continued to perpetuate the fiction and fraud that BIH's revenues were not overstated.

123.    The Acuntos, on behalf of Beacon, reasonably relied on Potter's misrepresentations in deciding to purchase BIH and in calculating and agreeing upon the BIH purchase price or for calculating and agreeing upon the condition precedent terms that must be satisfied before Potter was entitled to payment of the $1 million holdback.

Potter's Misrepresented the Nature of the Ten Fraudulent Transactions

124.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's revenues in 2018 and 2019 by at least $1,139,242.50, and perhaps more.

125.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's fiscal year 2019 (July 1, 2018-June 30, 2019) revenue and EBITDA by at least $696,342.50, and perhaps more.

126.    Potter's fraud and misrepresentations resulted in his overstatement of BIH's gross revenues in the first two months of fiscal year 2020 (July and August 2019) by at least $442.900, and perhaps more.

127.    Potter consistently failed and refused to provide accurate data and explanation of BIH's financial data.  What financial and accounting information Beacon has been able to compile through its own efforts has shown convincing proof that Potter knowingly and intentionally misrepresented the financial condition of the Company.

128.    After repeated communications and expression of doubt concerning the validity of the above-referenced ten transactions, Potter realized that his fraudulent scheme was getting exposed.

129.    Potter admitted in post-closing correspondence with Beacon to misreporting many of these transactions.

130.    In a December 23, 2019 e-mail, knowing his fraudulent conduct had been discovered, Potter offered to repurchase BIH from Beacon.  Potter's offer was an attempt to prevent Beacon from discovering the further extent to which Potter had falsified BIH's financial and accounting records and taking appropriate action against him.

131.    Potter inflated BIH's net income, revenue, and EBITDA and, later, transmitted the fraudulent financial performance information to Beacon's owners with the purpose and effect of inducing Beacon into executing the SPA and purchasing BIH.

132.     Beacon would not have purchased BIH for $5 million had it known that BIH had not made $1.1 million in net income in 2018 (as Potter had told Beacon during the due diligence preceding the execution of the SPA).

133.     Had Beacon known that BIH actually generated *negative* income totaling $1.4 million in 2018, it would not have purchased BIH at all—for *any* price.

### Potter Failed to Disclose He Was Raiding BIH's Coffers by Misreporting Payments to Himself as Royalty Expenses

134.     Potter also failed to disclose to the Acuntos, and affirmatively concealed, that Potter issued royalty payments from BIH's accounts to himself and companies that Potter controlled. Potter misreported these distributions in BIH's books and records as royalty expenses incurred by BIH.

135.     In 2018, Potter caused BIH to incur $2 million in royalty expenses paid to CLM Group, Inc. and Vacation Inspired Group, Inc., both entities controlled by Potter, as reflected in **Table 4** below:

### 2018 BIH Royalty Expense

| Date | Payee | Amount |
|------|-------|--------|
| 01/04/2018 | CLM Group, Inc. | $   1,300,000 |
| 05/01/2018 | CLM Group, Inc. | 600,000 |
| 06/29/2018 | Vacation Inspired Group, Inc. | 110,993 |
| **Total** | | $   **2,010,993** |

136.     In 2019, Potter caused BIH to incur an additional $1.3 million in royalty expenses paid to Waggy and CLM, both entities controlled by Potter, and to Potter in his personal capacity, as reflected in **Table 5** below:

**2019 BIH Royalty Expense**

| Date | Payee | | Amount |
|------|-------|---|--------|
| 03/06/2019 | Waggy Group, Inc. | $ | 250,000 |
| 04/26/2019 | CLM Charitable Initiative, Inc. | | 175,000 |
| 05/13/2019 | Waggy Group, Inc. | | 100,000 |
| 05/31/2019 | Loan & Exchange; Due to Adam Potter | | 18,000 |
| 06/25/2019 | Waggy Group, Inc. | | 540,000 |
| 06/28/2019 | Waggy Group, Inc. | | 97,000 |
| 9/3/2019 | Waggy Group, Inc. | | 150,000 |
| **Total** | | $ | **1,330,000** |

137.    Potter made all of BIH's 2019 royalty payments, except for the final payment, in the last quarter of BIH's FYE 2019.  Potter issued BIH's final royalty payment on September 3, 2019, the same day that Beacon purchased BIH, but failed to disclose this fact to the Acuntos.[17]

## VI.    Potter Failed to Disclose and then Falsely Represented that BIH Under His Ownership Was Not Subject to the Covenant Not to Compete in the Institutes Contract

138.    The Institutes Contract, a true and correct copy of which is attached hereto as **Exhibit 3**, prohibits the "Selling Parties," which include Potter and C&E, and "Affiliates" of the Selling Parties, from conducting activities that compete with any of the Sellers' Businesses.  (*See* Ex. 3, § 6.12(a).)

139.    Read together, Section 6.12(a) and Schedule 6.12 of the Institutes Contract prohibit Potter and entities, including C&E, and their affiliates, while under his ownership, from offering or promoting educational content that extends beyond the offerings provided by BIH, LLC (later

---

[17] According to BIH's QuickBooks journal entries, the $18,000 royalty expense incurred by BIH on May 31, 2019 was recorded as a debit to Royalty Expense and a credit to Loan & Exchange. The description under the Loan & Exchange account states, "Due to Adam Potter."

known as PBIH, LLC) on June 1, 2018 and competes with the CLM business of offering events and conferences to claims and litigation management professionals.

140.    Section 6.12(b) of the Institutes Contract contains a further covenant against the solicitation of Sellers' customers and business relations.

141.    On or about July 29, 2019, the Institutes sent a cease and desist letter and notice of breach ("Notice of Breach") to Potter.  A true and correct copy of the Notice of Breach is attached hereto as **Exhibit 4**.

142.    The July 29, 2019 Notice of Breach notified Potter that the Institutes had recently learned Potter, through his company BIH, LLC, was "offering, promoting and producing the Cannabis & Hemp Conference and the Intellectual Property Conference (the 'IP Conference' and collectively, with the C&H Conference, the 'BI Conferences'), scheduled for October 24-25, 2019 and October 24, 2019, respectively, [at] the New York Marriott Marquis . . . ."  (Ex. 4, at 1.)

143.    The July 29, 2019 Notice of Breach further made clear that "[t]his letter shall (i) service as written notice that you are in breach of your covenant not to compete as set forth in the [Institutes Contract]; (ii) constitute a demand that you immediate cease and desist all activities, including cancellation of the BI Conferences serving as the basis for such breach; and (iii) constitute written notice that such breach entitles the Buyer to indemnification under Section 9.2(a) of the [Institutes Contract], which includes, without limitation, the right to recover[] any and all Losses, such as attorneys' fees and any expenses and costs incurred by the Buyer Indemnified Party in connection with enforcing its rights thereunder."  (Ex. 4, at 1.)

144.    The July 29, 2019 Notice of Breach further reminded Potter that "[p]ursuant to Section 6.12(a) of the Purchase Agreement, you have agreed not to, and to cause your Affiliates not to, directly or indirectly, 'conduct, manage, operate [and] engage in . . . any business or

enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses' unless such activity constitutes a Permitted Activity." (Ex. 4, at 1-2.)

145.   According to the July 29, 2019 Notice of Breach, "[t]he BI Conferences are a clear breach of your covenant not to compete, and likely constitute a breach of the other restrictive covenants in [the Institutes Contract] as well." (Ex. 4, at 2.) According to the Notice of Breach, which Potter received hallway through the due diligence process for the sale of BIH to Beacon, the BI Conferences are not a "Permitted Activity" under the Institutes Contract.

146.   As of July 29, 2019, Potter knew that C&E, the predecessor entity to BIH, was subject to the Non-Compete in the Institutes Contract.

147.   As of July 29, 2019, Potter knew or should have known that the Institutes believed BIH, LLC (the predecessor to PBIH, LLC) was subject to the Non-Compete in the Institutes Contract.

148.   The Institutes were not at that time aware that Potter had created a new entity, BIH, as a successor to C&E or that BIH, under Potter's ownership, was an "affiliate" of C&E may be subject to the Non-Compete in the Institutes Contract.

149.   At no time did Potter reveal to Beacon's owners that he had reason to believe the Institutes believed that BIH might be subject to and bound by the Non-Compete in the Institutes Contract.

150.   At no time did Potter provide a copy of the Notice of Breach to the Acuntos.

151.   Instead, Potter affirmatively and deliberately concealed this information from the Acuntos and Beacon in an effort to avoid disruption of the potential sale of BIH.

152.    On or about August 12, 2019, the Institutes sent a second cease and desist letter and notice of breach ("Second Notice of Breach") to Potter.  A true and correct copy of the Second Notice of Breach is attached hereto as **Exhibit 5**.

153.    The August 12, 2019 Second Notice of Breach reflected and referred to a conversation that, among other things, set forth grounds the Institutes believed confirmed its position that Potter, through his entities, had breached the Non-Compete in the Institutes Contract as a result of Potter's intention to proceed with the BI Conferences.  (Ex. 5, at 1.)

154.    At no time did Potter reveal to Beacon's owners that he believed BIH might be subject to and bound by the Non-Compete in the Institutes Contract.

155.    At no time did Potter provide a copy of the Second Notice of Breach to the Acuntos.

156.    Instead, Potter affirmatively and deliberately concealed this information from Beacon in an effort to avoid disruption of the potential sale of BIH to Beacon.

157.    On August 28, 2019—less than a week before Beacon executed the SPA with Potter—the Institutes commenced a lawsuit against Potter and BIH, LLC (the predecessor to PBIH, LLC), entitled *The American Institutes for Chartered Property Casualty Underwriters, et al. v. Potter, et al.*, No. 1:19-cv-1600 (D. Del) (the "Delaware Federal Action").

158.    The original complaint in the Delaware Federal Action alleged, among other things, Potter and BIH, LLC violated the Non-Compete in the Institutes Contract by coordinating and operating risk-management conferences that competed with risk-management conferences now coordinated and operated by the Institutes through CLM.  The Institutes further alleged that Potter and BIH, LLC breached the Institutes Contract by soliciting CLM sponsors.

159.    Prior to execution of the SPA, Potter made intentional, material misrepresentations and omissions to Beacon regarding the impact of the Institutes' Contract, and the Non-Compete,

in particular, regarding Beacon's ability to operate BIH's risk management conference business under his ownership.

160.    Among other misrepresentations and omissions, Potter failed to disclose the Institutes Contract in Section 3.05(a) of the Disclosure Schedule of the SPA and failed to disclose the scope of the Institutes Non-Compete and the Delaware Federal Action in Schedule 3.09 of the SPA.

161.    The SPA contained a number of representations and warranties made by Potter on which Beacon's purchase of BIH was conditioned.  Indeed, Section 5.01 stipulates that "[t]he obligations of [Beacon to] . . . purchase . . . the Company . . . are [] subject to the satisfaction [] by [Potter] of the . . . representation and warranties of [Potter] set forth in [the SPA] [which] shall be true and correct in all material respects as of the date of the [SPA]."

162.    Section 8.04 of the SPA further states that "[a]ll representations and warranties shall survive the Closing . . . ."

163.    In Section 3.06(a), Potter affirmed that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for trivial contracts entered into in the ordinary course of business.  Section 3.05(a) of the Disclosure Schedule is blank.  Potter misrepresented that BIH was not subject to any such contracts while under his ownership and control and at the time of closing that would limit or encumber BIH from doing anything, or obligate BIH to do something.  That representation—or material omission—by Potter was false because, among other reasons, Potter had received the Notice of Breach and Second Notice of Breach before executing the SPA with Beacon but failed to disclose to Beacon the nature of the demands.

164.    As described below, BIH under Potter's ownership was an "Affiliate" of a "Selling Party" and, thus, bound by and subject to the Non-Compete in the Institutes Contract.

165.    Upon information and belief, CLM offers conferences to risk management professionals similar to those offered by BIH.

166.    As described above, Beacon acquired BIH with the intention of expanding BIH's risk-management conference portfolio.  Despite informing Potter of this fact, Potter failed to disclose the Institutes Contract to the Acuntos while negotiating and executing the SPA.

167.    Section 3.09 of the SPA states that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened" against BIH.

168.    Although Potter disclosed the Delaware Federal Action in Schedule 3.09, he materially mischaracterized the scope of the Non-Compete by writing in pertinent part:

> In June 2018, Adam Potter [] sold three companies to The Institutes. The Institutes Contract contained a non-compete *for Adam Potter personally, however Business Insurance is not part of the agreement*.  (emphasis added).

169.    Potter's disclosure in Schedule 3.09 was false and misleading, as least as to the entities then owned by Potter.

170.    Potter affirmatively misrepresented that the non-compete applied only to "Adam Potter personally."

171.    The Non-Compete explicitly applies to "a Selling Party," defined to include the "Companies, Potter, and Moxie" and "Affiliates" thereof.  (Ex. 3, § 6.12.)  "Companies" is expressly defined to include C&E.  "Affiliates" is defined as "any Person directly or indirectly controlling, controlled by, or under common control with," *inter alia*, Potter and C&E.[18]

---

[18] Indeed, in Potter's motion to dismiss the Institutes' amended and supplemental complaint, Potter represented that the agreement entered into between C&E and the Institutes binds BIH.  Potter's

172.     Potter concealed the true nature of the Institutes Contract and the Delaware Federal Action while negotiating and finalizing the SPA.  He did so in order to avoid risk that Beacon would terminate the purchase or insist on a lower purchase price to account for the fact that BIH could potentially become an encumbered company.

173.     As such, so long as C&E and, later, BIH remained under the ownership and control of Potter, it was subject to and bound by the Non-Compete.

174.     Potter knew this, because he agreed to bind C&E to the Non-Compete.  He then renamed C&E as BIH shortly after executing the Institutes Contract but more than a year *before* Beacon purchased BIH from Potter.

175.     At the time Potter made the misrepresentation and mischaracterized the scope of the Non-Compete in Schedule 3.09 of the SPA prior to the sale of BIH to Beacon, BIH was owned by Potter and, thus, an "Affiliate" covered by the Asset Purchase Agreement and the Non-Compete therein.

176.     Potter's assurances that BIH was *not* bound by the Non-Compete *under his ownership* was materially false and induced Beacon to proceed with the purchase of BIH.  This is the case, even though under Beacon's ownership, it was BIH's firmly supportable position in the Delaware Federal Action that it is not subject to the Non-Compete.

177.     As set forth in BIH's Opening Brief in Support of Motion to Dismiss the Amended and Supplemental Complaint in Delaware Federal Action ("Motion to Dismiss"), BIH makes clear its position that it is not subject to the Non-Compete under Beacon's ownership.

---

assertion in his motion to dismiss directly conflicts with his prior representations in the SPA and in correspondence with Beacon before and after execution of the SPA.

178.     Despite his later opportunistic endorsement of BIH's Motion to Dismiss, Potter has nonetheless explicitly advanced the position that BIH *is subject to the Non-Compete* and even went so far as to encourage the Institutes that the proper defendant subject to the Non-Compete was BIH which, in turn, prompted the Institutes to name BIH as a defendant in the Delaware Federal Action.

179.     In an e-mail communication on or about January 30, 2020, after Potter's counsel claimed PBIH was not a proper defendant, counsel for the Institutes inquired of Potter whether he was "willing to identify the 'correct' party that purportedly should be sued instead of Business Insurance Holdings, LLC?"  Through several e-mail exchanges, on or about February 19, 2020, Potter's counsel identified "Business Insurance Holdings, Inc., a Florida corporation" as the "correct party" to sue instead of "Business Insurance Holdings, LLC."  A true and correct copy of the above e-mail exchange is attached hereto as **Exhibit 6**.

180.     At Potter's insistence and invitation, then, on March 27, 2020, the Institutes filed an amended and supplemental complaint in the Delaware Federal Action to assert legal claims against BIH alleging that the Non-Compete is enforceable against BIH as a successor to C&E, even under new ownership by Beacon.  A true and correct copy of the amended and supplemental complaint in the Delaware Federal Action is attached hereto as **Exhibit 7**.  The Institutes further allege that BIH would be in continued breach of the Non-Compete if, under Beacon's ownership, BIH continued to operate risk-management conferences similar to those offered by CLM.

181.     Potter's false representation is further evidenced by his motion to dismiss the Delaware Federal Action, filed May 1, 2020, in which Potter affirmatively states that BIH, even under new ownership by Beacon, is a party to and bound by the Institutes Contract and, in particular, the Non-Compete.

182.     BIH does not concede that it is subject to the Non-Compete.  By failing to disclose the Institutes Contract in Schedule 3.05(a) of the SPA, however, and failing to fully and accurately disclose the Non-Compete in Schedule 3.09 of the SPA, Potter failed to satisfy his representations and warranties upon which the SPA was predicated.  His misrepresentations and omissions were knowing and intentional given that, among other reasons, he received the Notice of Breach and Second Notice of Breach before executing the SPA with Beacon.

183.     Potter also led the Acuntos, on behalf of Beacon, to reasonably believe that the Non-Compete applied only to Potter, not to any entities he owned or controlled.  The plain language of the Non-Compete and the Notice of Breach and Second Notice of Breach make clear that entities owned by Potter were also covered by the Non-Compete, at least insofar as he maintained ownership of those entities.

184.     Potter made the material misrepresentations and omissions described above with the purpose and effect of inducing Beacon into executing the SPA.

185.     Beacon's owners reasonably relied on Potters material misrepresentations and omissions in deciding whether to proceed with the purchase of BIH.

186.     Beacon would not have executed the SPA, and certainly not for the agreed-to sales price, conditions and other terms of the sale, but for Potter's representation that Beacon was purchasing an unencumbered entity (i.e., an entity that was able to generate revenue through organizing risk management conferences—the very same activity it was prohibited from conducting under the Non-Compete).

**VII.     Potter Breached the SPA and Express Warranties**

187.     Potter breached the SPA and its material, express representations and warranties that Beacon relied upon to value BIH and execute the SPA.

188.     The SPA requires that "[t]he representations and warranties of Seller set forth in this agreement shall be true and correct in all material respects as of the Date of this agreement." (Ex. 1, § 5.01(a).)

189.     Potter breached Section 3.06 of the SPA.  Section 3.06 imposed a duty upon Potter to disclose in Section 3.05(a) of the Disclosure Schedule all of BIH's non-exempt contracts.  (Ex. 1, § 3.05(a).)  Potter failed to do so.  Instead, he left Section 3.05(a) of the Disclosure Schedule blank when he had an affirmative duty and obligation to disclose certain information about contracts to which BIH, under his ownership, was bound, encumbered and had obligations.

190.     Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract and, in particular, the Non-Compete that applied to BIH under Potter's ownership and if, as he later contended in his motion to dismiss in the Institutes Action, he believed BIH was bound to it under Beacon's ownership.

191.     The Institutes Contract was a non-exempt contract under Section 3.06(a) given that the Institutes Contract resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes and Section 6.12 of the Institutes Contract bound C&E to the Non-Compete.

192.     Beacon relied upon Potter's disclosures—specifically, the lack of any non-exempt contracts—in Section 3.06 in its negotiations with Potter over a purchase price for BIH that would be commensurate with the value of Beacon's acquisition.

193.     Potter knew that Beacon would rely, and did rely, on this information and his fraudulent disclosure schedule.

194.     For instance, on or about June 14, 2019, in response to a request to Potter for "a list of conferences annually," Potter provided a list of conferences hosted by BIH under his ownership.

195.     Beacon suffered damages resulting from this breach of Section 3.06.  Potter's breach exposed BIH to liability in the Delaware Federal Action.

196.     Potter's breach of Section 3.06 also exposed BIH to diminished future revenues. The court ultimately imposed a two-year injunction against BIH in the Delaware Federal Action, which significantly limits BIH's ability to hosts conferences, which previously accounted for a significant portion of BIH's profits.

197.     Even before the court entered judgment against BIH in the Delaware Federal Action, the mere threat of litigation and potential exposure caused BIH under Beacon's ownership, in an abundance of caution, to cancel at least one and potentially more lucrative conferences and forego other business opportunities that BIH believes it should otherwise have the ability to host and undertake.  In doing so, Beacon has lost the benefit of its bargain in acquiring BIH from Potter.

198.     Potter also breached Section 3.09 of the SPA.  Section 3.09 represents and warrants that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock." (Ex. 1, § 3.09.)

199.     Section 3.09 imposed a duty upon Potter to accurately disclose pending and threatened litigation relating to BIH.  Potter disclosed the Delaware Federal Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In particular, Potter affirmatively contended that BIH, under his ownership, was not subject to the Institutes Contract or the Non-Compete.  He intentionally omitted and failed to disclose that he actually believed BIH was subject to the Non-Compete and, thus, a proper defendant in the Delaware Federal Action, as he later represented to the Institutes and argued in his own Motion to Dismiss.

200.    Potter's description in Schedule 3.09 is materially inaccurate.

201.    Potter knew that his disclosure in Schedule 3.09 was intentionally misleading and materially inaccurate.  Potter further knew that when Beacon and Potter executed the SPA, BIH was, or would be with his encouragement to the Institutes, an anticipated defendant in the Delaware Federal Action, as evidenced by Potter's later contention in his motion to dismiss.

202.    Potter therefore breached Section 3.09 of the SPA by failing to disclose potential or threatened litigation against BIH.

203.    Beacon relied upon Potter's material misrepresentation and omission in Section 3.09 in its determination to continue with the purchase of BIH according to the sales price proposed by Potter.  In particular, Beacon relied on Potter's implicit assertion that no pending or impending litigation threatened to prevent BIH from hosting or operating conferences.  Potter knew that Beacon intended BIH to host and operate conferences because the parties discussed this very issue during the due diligence preceding the execution of the SPA.

204.    Potter knew that Beacon would rely, and did rely, on this information and his fraudulent disclosure schedule.

205.    Beacon suffered damages resulting from Potter's breach of Section 3.09.  Potter's breach has exposed BIH to, and resulted in significant liability in, the Delaware Federal Action.

206.    Potter's breach of Section 3.09 also exposed BIH to diminished future revenues because the court ultimately imposed a two-year injunction against BIH in the Delaware Federal Action, which significantly limits BIH's ability to hosts conferences, which previously accounted for a significant portion of BIH's profits.  Even before the court entered judgment against BIH in the Delaware Federal Action, the mere threat of litigation and potential exposure caused BIH under

Beacon's ownership to cancel potentially lucrative conferences Beacon believes it should otherwise have the ability to host.

207.    Potter breached Section 5.01(a) of the SPA by failing to disclose the Institutes Contract in Section 3.06 and Section 3.05(a) of the Disclosure Schedule and failing to disclose the Delaware Federal Action in Section 3.09 and Disclosure Schedule 3.09 of the SPA.

## VIII.    **Potter Sued Beacon in Delaware State Court, Improperly Obtaining a Default Which Was Later Vacated by the Court Due to Improper Conduct by Potter and His Current Counsel.**

208.    On January 30, 2020, Potter and his counsel filed a complaint under seal against Beacon in Delaware Superior Court, in an action styled *Potter v. Beacon Intercontinental Group, Inc.*, C.A. No. N20C-01-221 AML CCLD (Del. Super. Ct.) (the "Delaware State Action"), alleging that Beacon breached the SPA by not paying the $1 million final payment Potter claims Beacon owes under the SPA.  A true and correct copy of Potter's complaint in the Delaware State Action is attached hereto as **Exhibit 8**.

209.    Despite communicating previously and continuously with counsel for Beacon regarding the dispute that Potter had misrepresented BIH's revenues and fraudulently induced Beacon into executing the SPA, and despite having filed the Delaware State Action complaint under seal, counsel for Potter neither provided counsel for Beacon with a courtesy copy of the complaint nor otherwise notified counsel that Potter had sued Beacon under seal in Delaware Superior Court.

210.    On February 13, 2020, Potter contends he served Beacon's registered agent for service of process with a copy of the Delaware State Action complaint.  Beacon's registered agent failed to transmit the complaint to Beacon at that time and Beacon never received actual notice of the complaint.

211.    On March 5, 2020, Potter contends he obtained a clerk's default—again without notifying or conferring with Beacon or its counsel.  At that time, Beacon lacked actual notice of the Delaware State Action.  A true and correct copy of the clerk's default is attached hereto as **Exhibit 9**.

212.    In a series of e-mails between April 9 and 15, 2020, Potter's counsel demanded that BIH permit Potter to control the joint defense of Potter, his entity, and BIH in the Delaware *Federal* Action with counsel for Potter representing each defendant.  A true and correct copy of the Potter counsel e-mail exchanges are attached hereto as **Exhibit 10**.

213.    Counsel for Potter clearly articulated the intent of Fox Rothschild to represent BIH in the Delaware Federal Action.  In his April 9, 2020 e-mail, counsel for Potter wrote, "So that we may begin with that defense, please confirm in a written response to this e-mail that we [Fox Rothschild] have permission to accept service on behalf of BIH, Inc.  We [Fox Rothschild] are currently in the process of formulating a defense strategy, which may potentially include filing a dispositive motion seeking to have BIH, Inc. dismissed from the above-captioned lawsuit entirely." (Ex. 10.)

214.    Despite seeking to represent BIH in the Delaware *Federal* Action, Potter's counsel at Fox Rothschild never volunteered to BIH, Beacon or its counsel that they had represented Potter in suing and obtaining a clerk's default against Beacon, BIH's parent, in the Delaware *State* Action.

215.    BIH rejected Potter's and his counsel's request to assume its defense in the Delaware Federal Action, knowing that Potter and BIH had a conflict of interest.  (Ex. 10.)  That conflict of interest arose from BIH's firm and verified belief that Potter had defrauded Beacon by overstating BIH's EBITDA and revenues in order to inflate the purchase price Beacon ultimately

agreed to pay.  That conflict of interest arises from the verified fact that Potter invited and encouraged Plaintiffs in the Delaware Federal Action to sue BIH as a co-defendant.

216.    Given these facts, BIH had a good faith and well-founded belief that its interests were adverse to and divergent from Potter's in the Delaware Federal Action.

217.    Counsel for BIH and Beacon was *not* aware at the time Fox Rothschild made the demand that Potter and his counsel Fox Rothschild assume control of BIH's defense in the Delaware Federal Action that, more than month before, Potter and his counsel at Fox Rothschild had obtained a clerk's default against Beacon, BIH's parent company, in the Delaware State Action.

218.    In June 2020, counsel for Beacon discovered the Delaware State Action clerk's default while researching claims and defenses concerning the Delaware Federal Action.  This was the first that Beacon or the Acuntos, or their counsel, learned of the Delaware State Action or the clerk's default in that action.

219.    The clerk's default was not properly obtained.  It was the product of duplicitous and intentional efforts to obfuscate the fact that a complaint had been filed or served.

220.    On June 12, 2020, Beacon moved to set aside the clerk's default in the Delaware State Action.  Potter opposed.

221.    At the July 17, 2020 hearing, The Honorable Abigail LeGrow of the Delaware Superior Court granted Beacon's motion and set aside the clerk's default under Delaware Superior Court Civil Rule 60(b)(6).  As reflected in the transcript of that hearing, a true and correct copy of which is attached hereto as **Exhibit 11**, Judge LeGrow justified her ruling on grounds that she found "extraordinary circumstances" existed for doing so.

222.    Judge LeGrow pointed to the improper conduct of Potter and his counsel at Fox Rothschild, the same counsel in this case.  So shocked and dismayed at the impropriety of counsel's conduct was Judge LeGrow that she stated on the record "I'm, frankly, not looking to turn this into a written decision that could be embarrassing for certain people [i.e., Fox Rothschild counsel] so I'm going to give you my oral ruling."  (Ex. 11, at 57:22-58:3.)

223.    Judge LeGrow expressed shock at the behavior of Potter and his counsel, describing their actions as "troubling" and "very suggestive" of "underhanded activity."  (Ex. 11, at 33:1–15, 60:10–61:9.)

224.    Judge LeGrow expressed outrage that Fox Rothschild, on behalf of Potter, affirmatively misrepresented the nature of the action *in the instant case*.  To illustrate, Judge LeGrow asked counsel for Potter whether "the basis for the alleged default under the SPA is this indemnification issue" discussed above, that is, Fox Rothschild's demand the BIH retain Fox Rothschild to defend it in the Delaware Federal Action and permit Potter to control the defense of both he and BIH in the Delaware Federal Action, despite having obtained a clerk's default in the Delaware State Action only a month before.  Counsel for Potter expressly "dispute[d] the characterization" and specifically *denied* the original complaint in this instant action asserted a breach of contract claim based on this indemnification issue.  (Ex. 11, at 47:4-54:20.)  That denial was false.

225.    Judge LeGrow immediately confronted Potter's counsel by pulling out a copy of Potter's original complaint in this action and referred counsel to paragraphs 104-106 that, in her words, "specifically address this issue of the indemnification and Mr. Potter's right to assume control of BIH's defense and the fact that the Acuntos, on behalf of both Beacon and BIH, refused." (Ex. 11, at 54:22-55:8.)

226.     Judge LeGrow then quoted from paragraph 121 of Potter's original complaint in the instant action, to wit: "Lastly, Beacon breached the SPA by preventing Potter from exercising his right to assume and control BIH's defense in the Delaware District Court Action with counsel of its choice as provided in the SPA."  (Ex. 11, at 55:10-15.)

227.     Judge LeGrow's clear view, which was shared by the undersigned, is that Potter had no right to demand, and BIH had no obligation to permit, Potter and his counsel at Fox Rothschild to assume and control the defense of both Potter and BIH in the Delaware Federal Action.

228.     Judge LeGrow explained that she would have vacated the default "solely on the fact that Mr. Potter, represented by counsel [Fox Rothschild], was aware that the defendants were disputing the debt [at issue in the Delaware State Action]; was aware that the [D]efendants were represented by counsel relating to that very dispute; filed the complaint [in the Delaware State Action]; entered the direction for entry of default judgment; and never once provided a courtesy copy of th[e] [Delaware State Action] complaint or the default judgment, once it was obtained, to counsel."  (Ex. 11, at 60:12-21.)

229.     Judge LeGrow went further, however, to explain that Delaware Rule 60(b)(6) permits the court "a grand reservoir of equitable power to do justice in a particular case."  (Ex. 11, at 59:23-60:1.)

230.     Judge LeGrow noted that "what makes this a particularly troubling case and what makes me more than confident that Rule 60(b)(6) is the appropriate relief here is *what happened thereafter*."  (Ex. 11, at 61:12-15 (emphasis added).)

231.     Judge LeGrow ruled that "with default judgment in hand, Mr. Potter's counsel [Fox Rothschild] then sought to represent Beacon's subsidiary, BIH, in separate but related litigation

without disclosing the existence of the conflict.  And, to me, it is a very clear conflict under Rule 1.7 of the Rules of Professional Conduct."  (Ex. 11, at 61:16-23.)

232.    The conflict between Potter and BIH as presented in the Delaware State Action and presented by Potter and his counsel in this action, is a non-waivable conflict under Rule 1.7 of the American Bar Association's Model Rules of Professional Conduct.

233.    Judge LeGrow went further in her ruling vacating the default and admonishing Potter's counsel by stating "then to compound the error, Potter now contends that the defendants in this [New York Federal] action, the Acuntos' and Beacon's refusal of that representation, when there was a *very clear conflict of interest* that would prevent the representation . . . under rule 1.7, Potter now contends that the refusal amounts to a breach of the SPA and *has so argued in the Southern District of New York*.  So, at best, this is a breakdown in communication between counsel. *At best*.  I think it's something much less unintentional than that.  Or, to avoid the double negative, *much more intentional than that*, and so this Court is not going to be a tool by which parties or their counsel try to gain a leg up in other litigation or try to mask what is going on for purposes of achieving something in other related disputes."  (Ex. 11, at 62:3-23 (emphasis added).)

234.    On Monday, July 20, 2020, the very next business day, Potter voluntarily dismissed the Delaware State Action.  A true and correct copy of Potter's notice of voluntary dismissal of the Delaware State Action is attached hereto as **Exhibit 12**.

235.    Potter now has repurposed his claim to recover on the Promissory Note in the Delaware State Action into Count I of the Amended Complaint in this New York Federal Action.

236.    Potter also continues to maintain in the Amended Complaint, despite admonitions by Judge LeGrow and a very clear conflict under the Rule 1.7 of the Rules of Professional Conduct,

that BIH "denied Potter his contractual rights under the SPA's Indemnification Procedures . . . ." (Am. Compl., ¶ 196.)

## IX.  **Potter Declined to Defend, and Failed His Duty to Indemnify, Beacon and BIH**

237.    Potter repeatedly promised to defend and indemnify BIH in the Delaware Federal Action.

238.    However, once the Institutes sued BIH, Potter never offered to defend BIH in the Delaware Federal Action with unconflicted counsel, even after the scathing ruling by Judge LeGrow admonishing Potter's counsel for violating the ethical rules by demanding BIH to permit Potter's counsel (same counsel as in this case) to represent BIH and control the defense without disclosing the conflict at the time.

239.    And, after the court entered judgment against BIH in the Delaware Federal Action, Potter refused to indemnify BIH for the vast majority of its covered losses.

240.    On August 13, 2019, prior to execution of the SPA, Stephen Acunto, Jr., emailed Potter, "Any updates on the non-compete with CLM?"  Potter replied, "Nothing yet – I have another call with our attorneys next week.  If there are any issues – you will be indemnified."  A true and correct copy of the above e-mail exchange is attached hereto as **Exhibit 15**.

241.    Potter testified similarly at his deposition in the above-captioned matter, admitting that prior to execution of the SPA, Potter told Beacon he was "willing to . . . defend and indemnify them . . . if anything came of" the Delaware Federal Action.  Transcript of the Deposition of Adam Potter (July 27, 2022), at 235:25–236:4.  A true and correct copy of an excerpt of the transcript of the January 27, 2022, deposition of Adam Potter is attached hereto as **Exhibit 16**.

242.    Potter testified consistently at his deposition in the Delaware Federal Action, conceding that he "agreed to indemnify them" in any litigation concerning the Non-Compete. Transcript of the Deposition of Adam Potter (June 16, 2021), at 177:4–7.  A true and correct copy

of an excerpt of the transcript of the June 16, 2021, deposition of Adam Potter is attached hereto as **Exhibit 17**.

243.    The SPA memorializes Potter's obligation to indemnify BIH and provide BIH with a good faith defense in the Delaware Federal Action.

244.    Section 8.01 of the Stock Purchase Agreement stipulates, "Subject to the limitations set forth in Section 8.03, the Seller shall indemnify Buyer and its directors, officers, employees, agents, and Affiliates (the "Buyer Indemnified Parties") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third party legal fees and expenses has been received (collectively, "Losses" and each a "Loss"), to the extent arising or resulting from" various events, including "any breach of any covenant of Seller contained in this Agreement;" or "the inaccuracy or any breach of any representation or warranty made by Seller in this Agreement."  (Ex. 1, § 8.01.)

245.    BIH is an affiliate of Beacon and therefore constitutes one of the Buyer Indemnified Parties under the SPA.

246.    The parties handwrote and initialed SPA Section 8.01(b), which stipulates, "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09," which describes the Delaware Federal Action.  (Ex. 1, § 8.01(b).)

247.    Potter's indemnification obligations reflected in SPA Section 8.01(b), which the parties inserted to specifically address the Delaware Federal Action, supersede the limitations on Potter's other duties to indemnify, which are reflected in SPA Section 8.03.

248.    Section 8.02 of the Stock Purchase Agreement contains indemnification procedures, stipulating, "If any party (the 'Indemnified Party') receives notice of the

commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under this ARTICLE VII (a 'Third Party Claim') and such Indemnified Party intends to seek indemnity pursuant to this ARTICLE VIII, the Indemnified Party shall promptly provide the other party (the 'Indemnifying Party') with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant document evidencing such Third Party Claim and the basis for indemnification sought.  Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from its indemnification obligations hereunder, except if and to the extent that the Indemnifying Party is actually prejudiced thereby."  (Ex. 1, § 8.02.)

249.    Section 8.02 continues, "The Indemnifying Party will have 20 days from receipt of any such notice of a Third-Party Claim to give notice to assume the defense, appeal or settlement proceedings thereof.  If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume and control the defense, appeal or settlement proceedings of the Indemnified Party against the Third-Party Claim with counsel of the Indemnifying Party's choice."  (Ex. 1, § 8.02.)

250.    Section 8.02 further stipulates, "The parties will act in good faith in responding to, defending against, settling or otherwise dealing with such claims."  (Ex. 1, § 8.02.)

251.    By only offering BIH conflicted counsel in the Delaware Federal Action, Potter did not "act in good faith" in defending BIH against the Delaware Federal Action.  (Ex. 1, § 8.02.)

252.    Section 8.02 finally stipulates, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim within the time period specified above, the Indemnified Party may conduct such defense or settlement thereof with counsel of its choosing for the account of the

Indemnifying Party (subject to the right of the Indemnifying Party to dispute its obligation to the indemnify with respect to the matter which is the subject of the Third Party Claim)."  (Ex. 1, § 8.02.)

253.    Section 10.01 stipulates, "In the event of any dispute arising out of the subject matter of this Agreement, each prevailing party shall recover, in addition to any other damages assessed, its reasonable attorneys' fees and other costs and expenses incurred in litigating or otherwise settling or resolving such dispute."  (Ex. 1, § 10.01.)

254.    On September 20, 2019, after executing the SPA but prior to the Institutes amending their complaint to name BIH as a defendant, Potter's original counsel in the Delaware Federal Action, Bashian & Papantoniou, P.C., sent Potter and BIH a draft engagement letter for joint representation in the Delaware Federal Action and a proposed conflict waiver form.  A true and correct copy of the conflict waiver form is attached hereto as **Exhibit 18**.

255.    The proposed conflict waiver form stipulated, "While we will represent each of you to the best of our ability, clearly our emphasis will be on all of you as a group; we will not be in a position to claim that one of you is 'less culpable' or has less legal exposure than other parties being represented by our Firms."  (Ex. 18.)  The waiver form continued, "[T]o the extent that [Potter or BIH] might wish to pursue a strategy that casts blame or responsibility on other persons jointly represented by us, we would not be in a position to do so because of the need to represent each client's interests fairly and aggressively."  (*Id*.)

256.    BIH's primary argument in the Delaware Federal Action was that Potter and his affiliated entities, who signed the Non-Compete, were exclusively responsible for any ramifications under the Non-Compete.  Therefore, Potter's counsel, Bashian & Papantoniou, P.C.,

foreshadowed the conflict that precluded Potter and BIH from being jointly represented in the Delaware Federal Action.

257.    On September 20, 2019, in response to the proposed joint representation, Steve Acunto, on behalf of BIH, emailed Potter, "it has been suggested that I secure separate counsel so that no whiff of anything untoward is set in play." Potter replied, "Let me check with counsel and see what they say. May be a good idea." A true and correct copy of the above e-mail exchange is attached hereto as **Exhibit 19**.

258.    However, Potter subsequently replied, "I don't think it is necessary to retain separate counsel. I believe by having one counsel it sets a unified front and they represent both BI and me. I am responsible for all legal fees and will indemnify you (although their case is so we[a]k I don't believe it will come to that)." A true and correct copy of the above e-mail exchange is attached hereto as **Exhibit 20**.

259.    BIH did not engage Bashian & Papantoniou, P.C. and Potter ultimately substituted counsel, retaining Fox Rothschild to represent him in the Delaware Federal Action.

260.    On March 27, 2020, the Institutes filed an amended and supplemental complaint in the Delaware Federal Action, naming BIH as a defendant. This was *after* Potter prompted and encouraged the Institutes to name BIH as the proper party to sue in that case.

261.    Once the Institutes named BIH as a defendant, the only counsel that Potter offered to BIH in the Delaware Federal Action was Fox Rothschild, his counsel in the Delaware State Action, Delaware Federal Action, and this New York Federal Action.

262.    Such representation would be, as Judge LeGrow admonished, ethically prohibited because, among other things, Potter and his same counsel had simultaneously obtained a default judgment against Beacon, a corporate affiliate of BIH, in the Delaware State Action.

263.    Potter and BIH also had conflicting interests in the Delaware Federal Action because BIH, which continues to operate in the conference business, had a significant incentive to prevent the Institutes from obtaining an injunction enforcing the Non-Compete whereas Potter, who is no longer in the conference business, had no incentive to prevent such an injunction.

264.    Potter and BIH were in further conflict in the Delaware Federal Action because BIH ultimately filed crossclaims against Potter in that proceeding.

265.    Under New York law, where an indemnifying party has a duty to defend and either he or his counsel is in conflict with the indemnified party, the indemnifying party has a duty to reimburse the indemnified party for costs and fees incurred by independent counsel selected by the indemnified party.

266.    As a result of the numerous conflicts between BIH, Potter, and his counsel, BIH was entitled to counsel of its own choosing in the Delaware Federal Action at Potter's expense.

267.    Accordingly, on August 4, 2020, counsel for Beacon and BIH sent Potter, through undersigned counsel, a letter "as formal demand for indemnification from Potter in" the Delaware Federal Action.  A true and correct copy of the August 4, 2020 demand for indemnification is attached hereto as **Exhibit 13**.  The letter continues, "Beacon hereby exercises its contractual right to use counsel of its choosing for" its defense of the Delaware Federal Action.  (Ex. 13.)

268.    The August 4, 2020 letter satisfied the obligations of BIH and Beacon under SPA Section 8.02.  (*See* Ex. 13.)

269.    On August 14, 2020, counsel for Potter sent a letter to counsel for BIH and Beacon, explaining that Potter refused to indemnify, or reimburse BIH or Beacon for their defense, in the Delaware Federal Action.  A true and correct copy of Potter's counsel's response to the indemnification demand is attached hereto as **Exhibit 14**.

270.    Counsel for Potter claimed that "while Mr. Potter was certainly willing to incur the cost of hiring independent counsel of his choosing (and not Fox Rothschild), you clearly and unequivocally have rejected that proposal." (Ex. 14.)

271.    However, Potter had never, and has never, offered to retain independent counsel to represent BIH in the Delaware Federal Action after BIH was named as a defendant in that action.

272.    Potter only offered to defend BIH in the Delaware Federal Action under a joint representation with Potter by counsel of Potter's choosing and only on condition that Potter and his counsel, while conflicted and adverse to BIH, controlled the defense of BIH.

## X.    The Delaware Federal Court Entered Judgment Against BIH

273.    Following Potter's repudiation of his contractual obligations, independent counsel represented BIH in the Delaware Federal Action.

274.    To date, Potter has not advanced or reimbursed BIH for any of its defense costs in the Delaware Federal Action.

275.    On July 14, 2020, BIH filed a motion to dismiss the Institutes complaint. *Delaware Federal Action*, No. 1:19-cv-1600, ECF Nos. 65–67.

276.    On March 26, 2021, the court granted BIH's motion to dismiss, in part, dismissing two of the Institutes three causes of action against BIH. *Delaware Federal Action*, No. 1:19-cv-1600, ECF No. 137.

277.    Following extensive discovery and motions practice, the parties engaged in a three-day bench trial held from June 27, 2022, through June 29, 2022.

278.    On September 15, 2022, the court in the Delaware Federal Action entered a Trial Opinion, a true and correct copy of which is attached hereto as **Exhibit 21**.  In its Trial Opinion, the court:

a.  Found that "Potter told Mr. Acunto that BIH was not subject to the non-compete once it was sold to Beacon Intercontinental," (*id.* at 22);

b.  Found that "Potter told Mr. Acunto that the [Cannabis and Hemp] Conference would not violate the non-compete," (*id.* at 22);

c.  Held that (contrary to Potter's contractual representation in the SPA), BIH was subject to the Non-Compete in the Institutes Contract, (*id.* at 1 n.1);

d.  Held that Potter and BIH breached the Non-Compete by hosting the following conferences and webinars:  Cannabis and Hemp Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar, (*id.* at 9);

e.  Held that the Institutes failed to prove any damages with requisite certainty, (*id.* at 9);

f.  Awarded one dollar of nominal damages against both Potter and BIH, (*id.* at 17);

g.  Declined "to award injunctive relief against Potter" because he "is no longer in the insurance industry," (*id.* at 17); and

h.  Imposed a two-year injunction against BIH, preventing it "from offering specialty conferences that provide content related to claims and litigation management or that target claims and litigation management professionals," including the Cannabis and Hemp Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar, (*id.* at 19).

279.   On September 29, 2022, the court in the Delaware Federal Action entered a Final Judgment consistent with its Trial Opinion.  A true and correct copy of the Final Judgment is attached hereto as **Exhibit 22**.

280.   The Final Judgment also instructed "any party claiming to be a prevailing party" to "submit a bill of costs within fourteen days."  (Ex. 22 at 2.)

281.   On September 29, 2022, the court in the Delaware Federal Action entered a Permanent Injunction against BIH, restraining and prohibiting it "from promoting, marketing, offering, or holding any conference, seminar, webinar, or any similar event that provides any content related to claims and litigation management or that targets claims and litigation

management professionals, for a period of two years from the entry of this injunction." A true and correct copy of the Permanent Injunction is attached hereto as **Exhibit 23**.

282.   On October 13, 2022, the Institutes filed a Bill of Costs in the Delaware Federal Action, seeking $36,350.79 in reimbursement from Potter and BIH. A true and correct copy of the Institutes Bill of Costs is attached hereto as **Exhibit 24**.

283.   On October 19, 2022, the Institutes filed a Notice of Appeal in the Delaware Federal Action. A true and correct copy of the Institutes' Notice of Appeal is attached hereto as **Exhibit 25**.

284.   On October 27, 2022, BIH filed a Notice of Appeal in the Delaware Federal Action. A true and correct copy of the BIH Notice of Appeal is attached hereto as **Exhibit 26**. On the Institutes appeal as well as BIH's appeal, BIH expects to incur substantial additional attorneys' fees that are directly covered by Potter's indemnification obligation.

## XI.   Potter Again Breached His Duty to Indemnify BIH and Reimburse BIH For Its Defense

285.   To comply with the injunction imposed in the Delaware Federal Action, BIH canceled its 2022 Cannabis Conference, 2023 Cannabis Conference, 2024 Cannabis Conference, 2023 Long-Term Care Virtual Conference, 2024 Long-Term Care Virtual Conference, 2023 Cyber Risk Webinar, and 2024 Cyber Risk Webinar.

286.   Based on the past performance of those conferences and webinars, BIH anticipates losing $762,868 as a result of those cancelations alone.

287.   BIH also anticipates incurring additional damages and costs to comply with the injunction, including costs associated with restructuring and rebuilding its customer list and conference schedule.

288.     On October 7, 2022, BIH sent Potter a Renewed Notice of Demand for Defense Costs and Indemnification ("Renewed Notice").  A true and correct copy of the Renewed Notice is attached hereto as **Exhibit 27**.

289.     The Renewed Notice reiterated Potter's obligations to indemnify BIH in the Delaware Federal Action and reimburse BIH for costs and fees incurred therein by its independent counsel.

290.     The Renewed Notice detailed "BIH's presently known covered losses and damages," totaling $762,868, from the adverse judgment and injunction in the Delaware Federal Action.  (Ex. 27 at 2–3.)

291.     As detailed in the Renewed Notice, those losses resulted directly from BIH canceling conferences and events to comply with the injunction in the Delaware Federal Action.  (*Id*.)

292.     Potter had a duty under SPA Sections 8.01 and 8.01(b) to indemnify BIH for those losses.  (Ex. 1, §§ 8.01, 8.01(b).)

293.     The Renewed Notice also explained that "BIH anticipates that additional losses subject to Potter's duty to indemnify will accrue over the full two-year injunction period.  Potter will be liable for any and all business opportunities that BIH must forgo as a result of the injunction.  Potter will also be liable for business expenses incurred by BIH to comply with the injunction, including expenses related to BIH modifying and rebuilding its customer list to comply with the injunction."  (Ex. 27 at 3.)

294.     The Renewed Notice further explained that pursuant to SPA Section 8.02, Potter must reimburse BIH for attorneys' fees incurred by BIH in the Delaware Federal Action and reported that, as of October 7, 2022, those fees amounted to $1,497,049.60.  (Ex. 27 at 4.)  BIH

expects those fees to increase substantially as a result of the impending appeals in the Delaware Federal Action.

295.    Counsel for Potter responded to the Renewed Notice on October 21, 2022.  A true and correct copy of the October 21, 2022, letter is attached hereto as **Exhibit 28**.

296.    Potter's October 21, 2022, letter was signed by the same counsel that represented Potter in the Delaware State Action, Delaware Federal Action, and this New York Federal Action.

297.    In the October 21, 2022, letter, Potter agreed to indemnify BIH for the $1.00 in compensatory damages that the court imposed against BIH in the Delaware Federal Action.  (Ex. 28.)

298.    Potter, however, denied BIH's demand for "the additional purported injuries identified in" BIH's Renewed Notice, including BIH's demand for indemnification for losses resulting from the injunction imposed against BIH in the Delaware Federal Action.  (Ex. 28.)

299.    Potter's agreement to indemnify BIH for the $1 in compensatory damages award but refusal to indemnify BIH for losses attributable to the injunction confirms that Potter and BIH had conflicting interests in defending against the Institutes claims in the Delaware Federal Action.

300.    In the October 21, 2022, letter, Potter also denied BIH's demand for reimbursement of its defense costs in the Delaware Federal Action, writing that "Potter will not reimburse or cover any attorneys' fees that were incurred by counsel that Potter was prevented from choosing and as part of a defense that Potter was precluded from controlling or participating in, which ultimately resulted in the loss of available insurance coverage."  (Ex. 28.)

301.    Potter's pretext for refusing to reimburse BIH for its defense costs in the Delaware Federal Action was made in bad faith and is unsupported by applicable law.  As Judge LeGrow explained to Potter's same counsel in the Delaware State Action, Potter lacked any right to control

BIH's defense through Fox Rothschild—the only counsel offered by Potter to BIH after the Institutes named BIH as a defendant in the Delaware Federal Action—because there "is a very clear conflict of interest that would prevent the representation[.]"  (Ex. 11, at 62:3–12.)

302.    Potter's non sequitur that BIH's refusal to allow Potter to control its defense "resulted in the loss of available insurance coverage," (Ex. 28), illustrates another conflict of interest between BIH and Potter that precluded Potter from controlling BIH's defense in the Delaware Federal Action.

303.    At the commencement of the Delaware Federal Action, BIH's liability insurer asserted that the Institutes' cause of action against BIH for breach of contract was subject to a policy exclusion.  The insurer asserted further that the Institutes' remaining claims against BIH— tortious interference and unjust enrichment—were also likely subject to the policy exclusion.  However, subject to a reservation of rights, the insurer agreed to reimburse BIH for a portion of its attorneys' fees in the Delaware Federal Action while the tortious interference and unjust enrichment claims were pending.

304.    BIH filed a motion to dismiss all claims by the Institutes against BIH in the Delaware Federal Action.   The court granted the motion, in part, dismissing the tortious interference and unjust enrichment causes of action, but denying the motion as to the third claim for breach of the Non-Compete.

305.    BIH's liability insurer thereafter terminated its defense of BIH, refusing to reimburse BIH for attorneys' fees incurred defending against the Institutes' remaining cause of action for breach of contract.

306.    Potter's contention about insurance coverage in his October 21, 2022, letter, is therefore an admission that if Potter had controlled BIH's defense in the Delaware Federal Action,

he would not have sought dismissal of the tortious interference and unjust enrichment claims against BIH, preferring to expose BIH to unmeritorious claims in exchange for reducing his liability for BIH's legal fees.

307.    Potter's assertion regarding insurance coverage is also irrelevant because Potter's duty to reimburse BIH for its defense in the Delaware Federal Action is not predicated on insurance coverage.

308.    In his October 21, 2022, letter, Potter also suggested that had Potter controlled BIH's defense in the Delaware Federal Action, he would have prevented BIH from filing crossclaims against Potter in the Delaware Federal Action.  (Ex. 28.)

309.    BIH's crossclaims against Potter in the Delaware Federal Action ultimately survived Potter's motion to dismiss and motion for summary judgment and, although they did not prevail at trial, the adverse judgment is the subject of BIH's appeal.  Potter's assertion that he would have prevented BIH from filing those colorable claims highlights yet another conflict of interest between Potter and BIH.

310.    Each of those conflicts in the Delaware Federal Action, as well as the conflict arising from Potter suing BIH in the Delaware State Action and suing both BIH and Beacon in this New York Federal Action (each time with counsel from Fox Rothschild), precluded Potter from controlling BIH's defense in the Delaware Federal Action and required BIH to obtain independent counsel at Potter's expense.

311.    Potter's refusal to indemnify BIH for all covered losses and refusal to provide BIH with a good faith defense in the Delaware Federal Action constitute clear breaches of his contractual obligations under the SPA.

## COUNT I
## FRAUDULENT INDUCEMENT

312.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 252 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

313.    Potter knowingly, and with the intent to defraud, misrepresented BIH's 2017–2019 financial performance by providing the Acuntos with financial documents that inflated the Company's revenue, net income, and EBITDA during the due diligence period that preceded execution of the SPA.

314.    Only after executing the SPA and belatedly gaining access to the Company's Accounting Records did Beacon determine that more than $1.1 million in BIH's purportedly 2018 revenue, as reflected in the due diligence materials, was improperly categorized by Potter as revenue.  Potter directed ten (10) substantial cash transfers into and out of the Company between July 1, 2018 and September 1, 2019 from other entities he owned or controlled.  None of those transactions actually generated revenue for BIH.  These Potter therefore improperly characterized those transfers as revenue to Beacon with the net effect and intention of inflating revenues.

315.    Potter further fraudulently and falsely misrepresented income statements and other financial information for BIH as having generated positive $1.1 million in income in 2018 when, in fact, BIH generated *negative* income (i.e., losses) of $1.4 million—a differential of $2.4 million between what Potter had reported to Beacon (and what Beacon relied upon in agreeing to the $5 million purchase price) and what the true financial data supported.

316.    Potter further overstated 2018 EBITDA for BIH by approximately $2.4 million.

317.    Potter further misrepresented BIH's 2018 net income, revenue and EBITDA and presented this false financial information to Beacon in order to obtain a higher purchase price equal to five (5) times 2018 EBITDA.

318.    Potter further misrepresented BIH's revenue for July and August 2019 in order to further inflate BIH's financial performance and obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA calling for Beacon to make a final $1 million payment to Potter if BIH's gross annual revenues met or exceeded $5.25 million and gross revenues met or exceeded $2 million for the six months ending December 31, 2019.

319.    During the due diligence period, Potter also made intentional, material misrepresentations and omissions to the Acuntos, for Beacon, regarding the impact of the Institutes Contract on Beacon's ability to operate BIH's risk management conference business.

320.    Among other misrepresentations and omissions, in Schedule 3.09 of the SPA, Potter misrepresented to Beacon that C&E was not bound by the Non-Compete under his ownership, a fact Potter knew at the time to be false.  Potter further represented that BIH, while under his ownership, was also not bound by or subject to the Non-Compete, a fact Potter knew at the time to be false.

321.    After executing the SPA, Potter conceded that these representations were false.  In February 2020, Potter, through his counsel, encouraged the Institutes counsel in the Delaware Federal Action that BIH was the correct party to sue despite being under Beacon's ownership.

322.    Later, in his motion to dismiss the amended and supplemental complaint in the Delaware Federal Action, counsel for Potter wrote that "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes].  BIH, Inc., is the current name of C&E—one of the Selling Parties."

323.    Potter further concealed that, when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Delaware Federal Action.

324.     In Schedule 3.09 of the SPA, Potter represented that "[i]n June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however [BIH, Inc.] is not part of the agreement."  Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Non-Compete, Section 6.12, binds C&E and its "affiliates."  BIH, as a successor to C&E, was an "affiliate" while under Potter's ownership, a fact Potter knew.

325.     Potter knew that each of the material misrepresentations and/or material omissions were false and misleading at the time they were made.

326.     Potter controlled BIH's finances when he misrepresented BIH's past profits, revenues and EBITDA to Beacon's owners during the due diligence process.

327.     Potter also executed the Institutes Contract and was party to the Delaware Federal Action before making misrepresentations regarding those topics to Beacon during the due diligence process.

328.     Potter therefore knowingly made misrepresentations and omissions regarding the Company's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action, or caused them to be made, with knowledge of their falsity and/or recklessly without regard for their truthfulness.

329.     Potter made such false and fraudulent misrepresentations and omissions with the intent to deceive Beacon's owners, and with the intent to induce Beacon's owners to enter into the SPA and a gross overvaluation of BIH purporting to be five (5) times BIH's 2018 EBIDTA, but was not.

330.     In deciding to enter into the SPA, Beacon's owners reasonably relied to their detriment on Potter's misrepresentations concerning BIH's past profits, the nature of the Institutes

Contract, and the nature of the Delaware Federal Action.  Potter was the person most knowledgeable regarding those topics, and his misrepresentations materially altered the cost-benefit analysis conducted by Beacon's owners in deciding to execute the SPA.  If not for its reliance on Potter's misrepresentations, Beacon would not have executed the SPA—*at any price*, let alone $5 million.

331.    Beacon requests monetary damages from Potter in an amount to be determined at trial—including but not limited to the purchase price of BIH.

## COUNT II
## NEGLIGENT MISREPRESENTATION

332.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 272 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

333.    Potter had unique, non-public knowledge regarding BIH's past financial performance, the Institutes Contract, and the Delaware Federal Action that was unavailable to Beacon during its due diligence process.

334.    Potter, at least carelessly and negligently, made false and misleading representations and omissions of material facts directly to Beacon and its representatives during the due diligence and negotiation periods.

335.    Potter, at least carelessly and negligently, made false and misleading representations and omissions to Beacon and its representatives regarding BIH's 2017–2019 financial performance by providing the Acuntos with financial documents that inflated BIH's revenue, net income, and EBITDA during the due diligence period that preceded execution of the SPA.

336.    Potter, at least carelessly and negligently, overstated BIH's purported 2018 revenue by nearly $1.1 million in financial performance information provided by Potter to Beacon's

owners.  Potter misrepresented BIH's 2018 net income and revenue in order to obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA that Beacon would purchase BIH for a multiple of five (5) times its 2018 calendar year EBITDA.

337.    Potter, at least carelessly and negligently, further misrepresented BIH's revenue for July and August 2019.  Potter did so in order to inflate BIH's financial performance and obtain a higher purchase price for BIH by virtue of Potter's and Beacon's agreement in the SPA calling for Beacon to make a final $1 million payment to Potter if BIH's gross annual revenues met or exceeded $5.25 million and gross revenues met or exceeded $2 million for the six months ending December 31, 2019.

338.    During the due diligence period, Potter also made, at least carelessly and negligently, material misrepresentations and omissions to Beacon regarding the impact of the Institutes Contract on Beacon's ability to operate BIH's risk management conference business.

339.    Among other misrepresentations and omissions, in Schedule 3.09 of the SPA, Potter misrepresented to Beacon that C&E was not bound by the Non-Compete under his ownership, a fact Potter knew or should have known at the time to be false.  Potter further represented that BIH, while under his ownership, was also not bound by or subject to the Non-Compete, a fact Potter knew or should have known at the time to be false.

340.    After executing the SPA, Potter conceded that these misrepresentations were false. In February 2020, Potter, through his counsel, encouraged the Institutes counsel in the Delaware Federal Action that BIH was the correct party to sue despite being under Beacon's ownership.

341.    Later, in his motion to dismiss the Amended Complaint, counsel for Potter wrote that "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes].  BIH, Inc., is the current name of C&E—one of the Selling Parties."

342.     Potter further concealed, at least carelessly and negligently, that when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Delaware Federal Action.

343.     In Schedule 3.09 of the SPA, Potter represented that "[i]n June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however Business Insurance is not part of the agreement."  Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Institutes Non-Compete, Section 6.12, binds C&E and its "affiliates."  BIH, as a successor to C&E, was an "affiliate" while under Potter's ownership, a fact Potter knew.

344.     Potter made each of these false representations and omissions at least carelessly and negligently.  He knew or should have expected that Beacon's owners would rely on the representations and omissions in agreeing to a gross overvaluation of BIH and enter into the SPA.

345.     Potter had a duty to impart correct information to Beacon because, as the as the sole owner of BIH and manager of its operations, he was in a special position to know the veracity of representations.

346.     Potter also had a duty to impart correct information to Beacon because he knew that Beacon and its representatives relied on his misrepresentations and omissions concerning BIH when entering into the SPA.  Among other indicia of his knowledge, on June 13, 2019, Potter e-mailed false and misleading financial figures regarding BIH to Steve Acunto and expressed his understanding and desire that Steve Acunto would utilize those figures in the due diligence process and to value BIH.

347.     Beacon reasonably relied on the aforementioned false representations and omissions in valuing BIH and executing the SPA.

348.     In deciding to enter into the SPA, Beacon's owners reasonably relied to their detriment on Potter's at least careless and negligent misrepresentations concerning BIH's past profits, the nature of the Institutes Contract, and the nature of the Delaware Federal Action.  Potter was the person most knowledgeable regarding those topics, and his misrepresentations materially altered the cost-benefit analysis conducted by Beacon's owners in deciding to execute the SPA.  If not for its reliance on Potter's at least careless and negligent misrepresentations, Beacon would not have executed the SPA—*at any price*, let alone $5 million.

349.     As a proximate result of Potter's negligent misrepresentation, Beacon suffered damages to be determined at trial.

350.     Beacon requests monetary damages from Potter in an amount to be determined at trial—including but not limited to the purchase price of BIH.

## COUNT III
## BREACH OF EXPRESS REPRESENTATIONS AND WARRANTIES

351.     Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 291 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

352.     The SPA by and between Potter and Beacon is a valid and binding contract and supported by adequate consideration.  Beacon fully satisfied its obligations under the agreement.  Potter has a duty to adhere to the provisions of the SPA.

353.     Potter breached express representations and warranties reflected in Sections 3.06(a) and 3.09 of the SPA.  Section 8.04 of the SPA states that "[a]ll representations and warranties shall survive the Closing . . . ."  (Ex. 1, § 8.04.)

354.     In Section 3.06(a), Potter represented and warranted that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for insignificant contracts "entered into in the ordinary course of business."  (Ex. 1, § 3.06(a).)

355.    Section 3.06 imposed a duty upon Potter to disclose all of BIH's non-exempt contracts.  Potter left Section 3.05(a) of the Disclosure Schedule blank, thereby asserting that BIH was not bound by any non-exempt contract under his ownership.

356.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract.  That agreement was non-exempt under Section 3.06(a) because it resulted in C&E, a predecessor to BIH, selling substantially all of its assets to the Institutes and bound C&E to the Non-Compete.

357.    After executing the SPA, Potter conceded that the Institutes Contract is a non-exempt contract.  Potter's motion to dismiss the Institutes' amended and supplemental complaint contends "BIH, Inc., on the other hand, is a party to the Purchase Agreement [with the Institutes]. BIH, Inc. is the current name of C&E—one of the Selling Parties."  (Potter Motion to Dismiss, at 9.)

358.    Potter therefore breached his Section 3.06(a) duty to disclose the Institutes Contract by leaving Section 3.05(a) of the Disclosure Schedule blank.

359.    The Section 3.06(a) representations and warranties are material because Beacon relied upon them in agreeing to a grossly overvalued and inflated purchase price of BIH and in entering into the SPA.  In particular, Beacon relied on Potter's implicit assertion that no previous agreement would prevent BIH from operating conferences.  Potter knew that Beacon relied on this information because on June 13, 2019, during the due diligence period, Steve Acunto e-mailed Potter to request "a list of conferences annually."  Potter replied on June 14, 2019, providing a list of conferences hosted by BIH.  Beacon used this information to decide to purchase Beacon for what it believed was a fair and reasonable price.

360.    Section 3.06(a) is a material provision in the SPA, upon which Beacon relied in valuing BIH and deciding to execute the SPA.  Section 3.06(a) was an integral part of the bargain and consideration between Beacon and Potter.

361.    In Section 3.09 of the SPA, Potter represented and warranted that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock."  (Ex. 1, § 3.09.)

362.    Section 3.09 imposed a duty upon Potter to disclose, in a materially accurate manner, all pending and threatened litigation relating to BIH.

363.    Potter disclosed the Delaware Federal Action in Schedule 3.09, but mischaracterized the litigation in an intentionally and materially misleading fashion.  In pertinent part, Potter described the litigation as follows: "In June 2018, Adam Potter [] sold three companies to The Institutes.  The Agreement contained a non-compete for Adam Potter personally, however Business Insurance is not part of the agreement."  (Ex. 1, Sched. 3.09.)

364.    Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Institutes Non-Compete binds the Selling Parties, which include C&E and its affiliates, and prohibits them from conducting activities that compete with any of the Sellers' Businesses, including the CLM business of offering events and conferences to claims and litigation management professionals.

365.    Potter knew that his description in Schedule 3.09 was intentionally misleading and materially inaccurate.  He further knew that when Beacon and Potter executed the SPA, BIH was an anticipated defendant in the Institutes Action.

366.    Potter therefore breached Section 3.09 of the SPA by failing to disclose threatened litigation against BIH.

367.     The Section 3.09 representations and warranties are material, and Beacon relied upon them in agreeing to a grossly overvalued and inflated purchase price of BIH and in entering into the SPA.   In particular, Beacon relied on Potter's implicit assertion that no pending or impending litigation threatened to prevent BIH from operating conferences.   Potter knew that Beacon relied on this information because on June 13, 2019, during the due diligence period, Steve Acunto e-mailed Potter to request "a list of conferences annually."  Potter replied on June 14, 2019, providing a list of conferences hosted by BIH.

368.     Section 3.09 is a material provision in the SPA, upon which Beacon relied in valuing BIH and deciding to execute the SPA.   Section 3.09 was an integral part of the bargain and consideration between Beacon and Potter.

369.     Beacon suffered damages resulting from this breach.   Potter's breach exposed BIH to liability in the Delaware Federal Action.

370.     Potter's breach also exposed BIH to diminished future revenues because the court ultimately imposed an injunction against BIH in the Delaware Federal Action, which significantly limits BIH's ability to hosts conferences, which previously accounted for a significant portion of BIH's profits.

371.     Potter's breach further damaged Beacon because it paid an inflated sales price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

372.     Beacon suffered damages as a proximate result of Potter's breach of express representations and warranties reflected in Sections 3.06(a) and 3.09 of the SPA.   Potter's breaches exposed BIH to liability in the Delaware Federal Action.   Potter's breaches further damaged Beacon because they resulted in Beacon paying an inflated price for BIH based on the reasonable

assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

373.    Beacon requests monetary damages from Potter in an amount to be determined at trial.

## COUNT IV
## BREACH OF CONTRACT

374.    Beacon and BIH repeat, reallege, and incorporate by reference, paragraphs 1 through 314 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

375.    The SPA by and between Potter and Beacon is a valid and binding contract and supported by adequate consideration.

376.    Beacon has fully satisfied its obligations under the agreement.

377.    Potter has a duty to adhere to the provisions of the SPA.

378.    Potter breached at least three provisions in the SPA.

379.    Potter breached Section 3.06(a) by not disclosing the Institutes Contract between C&E, its affiliates, and the Institutes.

380.    In Section 3.06(a), Potter represented and warranted that "Section 3.05(a) of the Disclosure Schedule, sets forth a list of all Contracts," entered into by BIH, with limited exceptions for insignificant contracts "entered into in the ordinary course of business."  (Ex. 1, § 3.06(a).)

381.    Section 3.06 imposed a duty upon Potter to disclose all of BIH's non-exempt contracts.

382.    Potter left Section 3.05(a) of the Disclosure Schedule blank, thereby asserting his belief that BIH was not bound by any non-exempt contract.

383.    Potter breached Section 3.06(a) of the SPA by failing to disclose the Institutes Contract.  That agreement was non-exempt under Section 3.06(a) because it resulted in C&E, a

predecessor to BIH, selling substantially all of its assets to the Institutes, binding C&E to the Institutes Non-Compete, and preventing BIH under Potter's ownership from conducting events and conferences for claims and litigation management professionals — the essence of its business and the reason Beacon acquired BIH.

384.    Potter breached Section 3.09 failing to disclose the Delaware Federal Action in a truthful and accurate manner.

385.    In Section 3.09 of the SPA, Potter represented and warranted that "[n]o action, suit or proceeding is pending or, except as set forth on Schedule 3.09, to the knowledge of seller, threatened against the Company . . . that relates to the Company's capital stock."  (Ex. 1, § 3.09.)

386.    Section 3.09 imposed a duty upon Potter to disclose, in a materially accurate manner, all pending and threatened litigation relating to BIH.

387.    Potter disclosed the Institutes Action in Schedule 3.09 but mischaracterized the litigation in an intentionally and materially misleading fashion.  In pertinent part, Potter described the litigation as follows: "In June 2018, Adam Potter [] sold three companies to The Institutes. The Agreement contained a non-compete for Adam Potter personally, however [BIH, Inc.] is not part of the agreement."

388.    Potter's description in Schedule 3.09 is materially inaccurate because, in addition to Potter, the Non-Compete binds the Selling Parties, which include C&E and its affiliates, and prohibits them from conducting activities that compete with any of the Sellers' Businesses, including the CLM business of offering events and conferences to claims and litigation management professionals.

389.     Potter therefore breached Section 3.09 of the SPA by failing to disclose threatened litigation against BIH.   At the time Potter executed the SPA, he knew this omission was misleading.

390.     Potter breached Section 5.01 of the SPA by making false and incorrect representations and warranties in Sections 3.06(a) and 3.09.

391.     Section 5.01 stipulates that the "representation and warranties of [Potter] set forth in [the SPA] shall be true and correct in all material respects as of the date of the [SPA]."  (Ex. 1, § 5.01.)

392.     Section 5.01 imposed a duty upon Potter to provide truthful and correct information in the SPA's representations and warranties, including those reflected in Sections 3.06(a) and 3.09 of the SPA.

393.     As set forth in more detail above, Potter made material misrepresentations in Sections in 3.06(a) and 3.09.

394.     These misrepresentations constitute an independent breach of Section 5.01.

395.     Beacon and BIH suffered, and will continue to suffer, damages as a proximate result of Potter's breaches of Sections 3.06(a), 3.09, and 5.01 of the SPA.

396.     Potter's breaches exposed BIH to diminished future revenues because the court ultimately imposed an injunction against BIH in the Delaware Federal Action, which significantly limits BIH's ability to hosts conferences, which previously accounted for a significant portion of BIH's profits.

397.     Potter's breaches resulted in BIH incurring significant legal expenses in the Delaware Federal Action.

398.    Potter's breaches further damaged Beacon because it paid an inflated sales price for BIH based on the reasonable assumption that BIH would generate future revenue from hosting conferences that the Institutes now claim BIH is prohibited from operating.

399.    Beacon and BIH requests monetary damages from Potter in an amount to be determined at trial.

**COUNT V**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

400.    Beacon repeats, realleges, and incorporates by reference, paragraphs 1 through 340 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

401.    New York recognizes an implied duty of good faith and fair dealing in all contracts to protect a party's reasonable expectations in the absence of the breach of an express term.

402.    Based on the due diligence that preceded execution of the SPA, Potter was aware that Beacon intended to obtain BIH in order to compliment the Acuntos' insurance industry holdings, including a group of entities owned and controlled by the Acuntos that offer services to insurance industry professionals.  As part of the due diligence, the Acuntos told Potter that they wanted to acquire BIH to augment their insurance-related holdings.

403.    During due diligence, Steve Acunto told Potter that he saw BIH as an attractive vehicle from which to offer risk-management conferences.

404.    Steve Acunto told Potter that he intended to expand BIH's conference offerings should he acquire the Company.

405.    Indeed, Beacon's press release concerning its acquisition of BIH expressly stated as much: "BIH Inc.'s *growing annual conference schedule* draws national audiences to destinations across the country for one and two day programs . . . ."  (Emphasis added.)

406.     With this knowledge, Potter acted in bad faith by failing to disclose accurately the scope of the Institutes Non-Compete and the Delaware Federal Action.

407.     Potter's representations in his motion to dismiss the Delaware Federal Action that the Institutes Contract **does** bind BIH evidences his bad faith during negotiations with Beacon and in disclosures under Schedule 3.09 of the SPA, where Potter stated otherwise.

408.     By acquiring an entity the Institutes asserts is encumbered by the Non-Compete, being a named defendant in the Delaware Federal Action at the insistence of Potter and his counsel, and being subject to the injunction in the Delaware Federal Action, Beacon is prejudiced and hindered in its ability to fully operate the business lines Beacon's owners expected in determining to purchase BIH, despite the fact that Beacon satisfied all of its obligations under the SPA.

409.     Although the SPA does not expressly stipulate that Beacon intended to operate BIH's insurance-industry conferences, by failing to disclose the Non-Compete, Potter denied Beacon the benefit of its bargain in acquiring BIH.

410.     Moreover, under the SPA, Potter was required to provide "the Books and Records of the Company" at closing, or, "for any such books and records which are not reasonably available at the Closing within thirty (30) Business Days following the Closing."  (Ex. 1, § 2.02(a)(iv).)

411.     After the closing, under the SPA, Potter was also required to "grant . . . access to financial records . . . in [his] possession . . . as shall be reasonably required" for "reasonable business purpose[s]" "upon reasonable prior notice."  (Ex. 1, § 6.01.)

412.     After multiple requests from Beacon, Potter finally belatedly provided Beacon with BIH's QuickBooks Accounting Records.  But the QuickBooks Accounting Records reflected a multitude of self-transfers between Potter and entities he owned or controlled.  These self-transfers

artificially inflated BIH's revenue, EBITDA and net income and, thus, artificially inflated the parties' negotiated purchase price for the SPA, as described above.

413.    Potter had a duty to provide accurate financial information concerning BIH both before executing the SPA (during due diligence) and after.

414.    Beacon had a reasonable expectation that the financial information Potter provided both before executing the SPA (during due diligence) and after would accurately reflect BIH's revenue, EBITDA and net income.  It did not.  Accordingly, Potter has breached the duty of good faith and fair dealing implied in the SPA.

415.    Accordingly, Beacon has suffered damages in an amount to be determined at trial.

## COUNT VI
## DECLARATORY JUDGMENT

416.    Beacon and BIH repeat, reallege, and incorporate by reference, paragraphs 1 through 356 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

417.    The Declaratory Relief Act states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201.

418.    Pursuant to 28 U.S.C. Section 2202, "further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

419.    On March 27, 2020, the Institutes filed an amended and supplemental complaint in the Delaware Federal Action to assert claims against BIH, alleging that BIH breached the Non-Compete by hosting various conferences.  (Ex. 7.)

420.   Under SPA Sections 8.01, 8.01(b), and 8.02, Potter had a duty to indemnify BIH in the Delaware Federal Action and a duty to provide BIH with a good faith defense in the Delaware Federal Action.

421.   Section 8.01 stipulates, "Subject to the limitations set forth in Section 8.03, the Seller shall indemnify Buyer and its directors, officers, employees, agents, and Affiliates (the 'Buyer Indemnified Parties') from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third party legal fees and expenses has been received (collectively, 'Losses' and each a 'Loss'), to the extent arising or resulting from" various events, including "any breach of any covenant of Seller contained in this Agreement;" or "the inaccuracy or any breach of any representation or warranty made by Seller in this Agreement."  (Ex. 1, § 8.01.)

422.   BIH is an affiliate of Beacon and therefore constitutes one of the Buyer Indemnified Parties under the SPA.

423.   SPA Section 8.01(b) stipulates that "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09."  (Ex. 1, § 8.01(b).)

424.   The Delaware Federal Action qualifies.

425.   Potter's indemnification obligations reflected in SPA Section 8.01(b), which the parties inserted to specifically address the Delaware Federal Action, supersede the limitations on Potter's other duties to indemnify, which are reflected in SPA Section 8.03.

426.   SPA Section 8.02 stipulates that where a party has a duty to indemnify, it has a corollary duty to defend.  The SPA, assuming that the indemnified and indemnifying parties will have aligned interests, grants the indemnifying party the right to assume and control the defense.

427. SPA Section 8.02 stipulates, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim . . ., the Indemnified Party may conduct such defense or settlement thereof with counsel of its choosing for the account of the Indemnifying Party (subject to the right of the Indemnifying Party to dispute its obligation to the indemnify with respect to the matter which is the subject of the Third Party Claim)."  (Ex. 1, § 8.02.)

428. Potter therefore had a contractual duty to indemnify BIH in the Delaware Federal Action and an accompanying duty to provide BIH with a good faith defense in the Delaware Federal Action.

429. In emails dated August 13, 2019, and September 20, 2019, and in subsequent deposition testimony, Potter conceded that he had a contractual duty under the SPA to indemnify and provide a defense for BIH in the Delaware Federal Action.  (Exs. 15, 19, 20.)

430. In correspondence dated April 9 and 14, 2020, counsel for Potter also acknowledge that Potter owes BIH a duty to defend and indemnify in the Delaware Federal Action.  (Ex. 10.)

431. In correspondence dated October 21, 2022, counsel for Potter again acknowledged Potter's duty to indemnify BIH in the Delaware Federal Action.  (Ex. 28.)

432. Under New York law, where an indemnifying party has a duty to defend and either he or his counsel is in conflict with the indemnified party, the indemnifying party has a duty to reimburse the indemnified party for costs and fees incurred by independent counsel selected by the indemnified party.

433. Potter and BIH had conflicting interests in the Delaware Federal Action because BIH maintained that Potter and his affiliated entities, who signed the Non-Compete, are exclusively responsible for any ramifications under the Non-Compete.  BIH further maintained

that Potter alone should be responsible for any damages and liability resulting from any violation of the Non-Compete.

434.    Potter and BIH had conflicting interests in the Delaware Federal Action because BIH, which continues to operate in the conference business, had a significant incentive to prevent the Institutes from obtaining an injunction enforcing the Non-Compete whereas Potter, who is no longer in the conference business, had no incentive to prevent such an injunction.

435.    That conflict was particularly acute because Potter acknowledges his contractual obligation to indemnify BIH for compensatory damages awarded in the Delaware Federal Action but denies his contractual obligation to indemnify BIH for losses attributable to the injunction issued against BIH in the Delaware Federal Action.  (Ex. 28.)

436.    Potter and BIH had conflicting interests in the Delaware Federal Action because, to preserve liability insurance coverage, Potter had an incentive to expose BIH to the Institutes' causes of action for tortious interference and unjust enrichment, while BIH had an incentive to obtain dismissal of those claims.

437.    Potter and BIH also had conflicting interests in the Delaware Federal Action because BIH filed crossclaims against Potter in that proceeding, one of which is the subject of BIH's impending appeal.

438.    In addition to conflicts within the Delaware Federal Action, Potter and his counsel, Fox Rothschild, were also in conflict with BIH because they sued Beacon, BIH's parent, in the Delaware State Action and the instant action.

439.    As Judge LeGrow explained in the Delaware State Action, Potter lacked any right to control BIH's defense through Fox Rothschild—the only counsel offered by Potter to BIH after

the Institutes named BIH as a defendant in the Delaware Federal Action—because there "is a very clear conflict of interest that would prevent the representation[.]"  (Ex. 11, at 62:3–12.)

440.    Because of those conflicts, Potter was never entitled to nor ethically permitted to assume and control the defense of BIH in the Delaware Federal Action.  Instead, Potter had a duty to reimburse BIH and Beacon for fees incurred by counsel of BIH's choosing in the Delaware Federal Action.

441.    Accordingly, on August 4, 2020, counsel for Beacon and BIH sent Potter, via counsel, a letter "as formal demand for indemnification from Potter in" the Delaware Federal Action and the above captioned litigation.  The letter continues, "Beacon hereby exercises its contractual right to use counsel of its choosing for" its defense of the Delaware Federal action and the above captioned litigation, "at Potter's expense."  This correspondence satisfied the SPA Section 8.02 indemnification procedures.  (Ex. 13.)

442.    On August 14, 2020, counsel for Potter sent a letter to counsel for BIH and Beacon, explaining that Potter would not indemnify, or reimburse BIH or Beacon for their defense, in either the Delaware Federal Action or the above captioned litigation.  (Ex. 14.)

443.    Counsel for Potter claimed that "while Mr. Potter was certainly willing to incur the cost of hiring independent counsel of his choosing (and not Fox Rothschild), you clearly and unequivocally have rejected that proposal."  (Ex. 14.)

444.    However, Potter had never, and has never, offered to retain independent counsel to represent BIH in the Delaware Federal Action.

445.    Potter only offered to defend BIH in the Delaware Federal Action under a joint representation with Potter by counsel of Potter's choosing under terms that Potter would be able to control the defense for both himself and BIH.

446. BIH therefore exercised its right under New York law and SPA Section 8.02 to obtain independent counsel of its choosing in the Delaware Federal Action, at Potter's expense.

447. On September 29, 2022, the court in the Delaware Federal Action entered a Final Judgment in favor of the Institutes against BIH, "in the amount of one dollar ($1.00), plus pre- and post-judgment interest, and equitable relief in the nature of a permanent injunction against BIH issued contemporaneously with the entry of this judgment." (Ex. 22.)

448. The Institutes subsequently filed a Bill of Costs in the Delaware Federal Action, seeking $36,350.79 in reimbursement from Potter and BIH. (Ex. 24.)

449. On September 29, 2022, the court in the Delaware Federal Action entered a Permanent Injunction restricting and prohibiting BIH "from promoting, marketing, offering, or holding any conference, seminar, webinar, or any similar event that provides any content related to claims and litigation management or that targets claims and litigation management professionals, for a period of two years from the entry of this injunction." (Ex. 23.)

450. To comply with the injunction, BIH canceled its 2022 Cannabis Conference, 2023 Cannabis Conference, 2024 Cannabis Conference, 2023 Long-Term Care Virtual Conference, 2024 Long-Term Care Virtual Conference, 2023 Cyber Risk Webinar, and 2024 Cyber Risk Webinar.

451. As a direct result of those cancelations, BIH will suffer at least $762,868 in losses, which BIH reasonably anticipated earning based on the past performance of those conferences and webinars.

452. BIH also anticipates incurring additional damages and costs to comply with the injunction, including costs associated with restructuring and rebuilding its customer list and conference schedule.

453.    BIH also anticipates incurring additional attorneys' fees in connection with the Delaware Federal Action, including fees related to appeals filed in the Delaware Federal Action.

454.    Under Section 8.01, 8.01(b), and 8.02 Potter had a duty to indemnify BIH for each of those losses and expenses.  (Ex. 1, § 8.01, 8.01(b), 8.02.)

455.    On October 7, 2022, BIH sent Potter a Renewed Notice, again demanding indemnification and reimbursement for its defense in the Delaware Federal Action.  (Ex. 27.)

456.    Potter responded on October 21, 2022, with a letter signed by his counsel in the Delaware State Action, Delaware Federal Action, and this New York Federal Action.  (Ex. 28.)

457.    In the October 21, 2022, letter, Potter agreed to indemnify BIH for the $1.00 in compensatory damages that the court imposed against BIH in the Delaware Federal Action.  (Ex. 28.)

458.    Potter, however, denied BIH's demand for indemnification for losses resulting from the injunction imposed against BIH in the Delaware Federal Action.  (Ex. 28.)

459.    Potter's refusal to indemnify BIH for losses attributable to the injunction was a breach of his obligation under SPA Section 8.01(b) to indemnify BIH for "any award, claim satisfaction or corollary action taken by Institutes as a result of the" Delaware Federal Action.  (Ex. 1, § 8.01(b).).

460.    In the October 21, 2022, letter, Potter also denied BIH's demand for reimbursement of its defense costs in the Delaware Federal Action, asserting that BIH was unentitled to reimbursement because it declined to allow Potter to control its defense in the Delaware Federal Action.

461.    Potter's letter failed to address the fact that Potter and his counsel were in conflict with BIH, which, under New York law, vested BIH with a right to select counsel of its choosing at Potter's expense.

462.    Potter's refusal to reimburse BIH for its defense costs therefore constituted a breach of Potter's duty to provide BIH with a good faith defense in the Delaware Federal Action.

463.    At all times, Beacon and BIH acted in good faith and satisfied their obligations under the SPA, including the indemnification procedures in SPA Section 8.02.

464.    To date, Potter has not advanced or reimbursed BIH for any of its defense costs in the Delaware Federal Action.

465.    To date, Potter has not indemnified BIH in the Delaware Federal Action.

466.    Potter therefore breached SPA Sections 8.01, 8.01(b), and 8.02.

467.    BIH therefore seeks a declaration from this Court that Potter owes BIH a duty to indemnify it in connection with the adverse judgment and injunction in the Delaware Federal Action and that Potter owes BIH reimbursement for legal fees and costs incurred by its counsel in connection with the Delaware Federal Action.

468.    Pursuant to 28 U.S.C. Section 2202, BIH also seeks monetary damages to be determined at trial for Potter's failure to indemnify and failure to provide BIH with a good faith defense in the Delaware Federal Action.

## COUNT VII
## CONTRACTUAL INDEMNIFICATION AND DEFENSE

469.    Beacon and BIH repeat, reallege, and incorporate by reference, paragraphs 1 through 409 of this Third Amended Counterclaim Complaint, as if set forth fully herein.

470.    Potter breached SPA Sections 8.01 and 8.02 by failing to indemnify and failing to provide BIH with a good faith defense in the Delaware Federal Action.

471.    Section 8.01 stipulates, "Subject to the limitations set forth in Section 8.03, the Seller shall indemnify Buyer and its directors, officers, employees, agents, and Affiliates (the 'Buyer Indemnified Parties') from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third party legal fees and expenses has been received (collectively, 'Losses' and each a 'Loss'), to the extent arising or resulting from" various events, including "any breach of any covenant of Seller contained in this Agreement;" or "the inaccuracy or any breach of any representation or warranty made by Seller in this Agreement."  (Ex. 1, § 8.01.)

472.    BIH is an affiliate of Beacon and therefore constitutes one of the Buyer Indemnified Parties under the SPA.

473.    SPA Section 8.01(b), which the parties handwrote and initialed, stipulates, "Indemnification by [Potter] includes indemnification for any award, claim satisfaction or corollary action taken by Institutes as a result of the litigation described in Section 3.09," which describes the Delaware Federal Action.  (Ex. 1, § 8.01(b).)

474.    Potter's indemnification obligations reflected in SPA Section 8.01(b), which the parties inserted to specifically address the Delaware Federal Action, supersede the limitations on Potter's other duties to indemnify, which are reflected in SPA Section 8.03.

475.    SPA Section 8.02 stipulates, in part, "If the Indemnifying Party has not Assumed the defense of a Third Party Claim within the time period specified above, the Indemnified Party may conduct such defense or settlement thereof with counsel of its choosing for the account of the Indemnifying Party[.]"  (Ex. 1, § 8.02.)

476.    On March 27, 2020, the Institutes filed an amended and supplemental complaint in the Delaware Federal Action to assert claims against BIH, alleging that BIH breached the Non-Compete by hosting various conferences.  (Ex. 7.)

477.    Potter therefore had a contractual duty to indemnify BIH in the Delaware Federal Action and an accompanying duty to provide BIH with a good faith defense in the Delaware Federal Action.

478.    In emails dated August 13, 2019, and September 20, 2019, and in subsequent deposition testimony, Potter conceded that he had a contractual duty under the SPA to indemnify and provide a defense for BIH in the Delaware Federal Action.  (Exs. 15, 19, 20.)

479.    In correspondence dated April 9 and 14, 2020, counsel for Potter also acknowledged that Potter owed BIH a duty to defend and indemnify in the Delaware Federal Action.  (Ex. 10.)

480.    In correspondence dated October 21, 2022, counsel for Potter again acknowledged Potter's duty to indemnify BIH in the Delaware Federal Action.  (Ex. 28.)

481.    Potter and BIH had conflicting interests in the Delaware Federal Action because BIH maintained that Potter and his affiliated entities, who signed the Non-Compete, are exclusively responsible for any ramifications under the Non-Compete.

482.    Potter and BIH had conflicting interests in the Delaware Federal Action because BIH, which continues to operate in the conference business, had a significant incentive to prevent the Institutes from obtaining an injunction enforcing the Non-Compete whereas Potter, who is no longer in the conference business, had no incentive to prevent such an injunction.

483.    That conflict was particularly acute because Potter acknowledges his contractual obligation to indemnify BIH for compensatory damages awarded in the Delaware Federal Action

but denies his contractual obligation to indemnify BIH for losses attributable to the injunction issued against BIH in the Delaware Federal Action. (Ex. 28.)

484. Potter and BIH had conflicting interests in the Delaware Federal Action because, to preserve liability insurance coverage, Potter had an incentive to expose BIH to the Institutes' causes of action for tortious interference and unjust enrichment, while BIH had an incentive to obtain dismissal of those claims.

485. Potter and BIH also had conflicting interests in the Delaware Federal Action because BIH filed crossclaims against Potter in that proceeding and, although they did not prevail at trial, the adverse judgment is the subject of BIH's impending appeal.

486. In addition to conflicts within the Delaware Federal Action, Potter and his counsel, Fox Rothschild, were also in conflict with BIH because they sued Beacon, BIH's parent, in the Delaware State Action and the instant action.

487. As Judge LeGrow explained in the Delaware State Action, Potter lacked any right to control BIH's defense through Fox Rothschild—the only counsel offered by Potter to BIH after the Institutes named BIH as a defendant in the Delaware Federal Action—because there "is a very clear conflict of interest that would prevent the representation[.]" (Ex. 11, at 62:3–12.)

488. Because Potter and his counsel, Fox Rothschild, are in conflict with BIH and Beacon, under New York law, BIH had a right to select independent counsel at Potter's expense.

489. On August 4, 2020, counsel for Beacon and BIH sent Potter, via counsel, a letter demanding indemnification in the Delaware Federal Action and reimbursement for BIH's defense costs incurred in that action. (Ex. 13.)

490.    On August 14, 2020, counsel for Potter sent a letter to counsel for BIH, explaining that Potter refused to indemnify or reimburse BIH for its defense in the Delaware Federal Action. (Ex. 14.)

491.    Counsel for Potter claimed that "while Mr. Potter was certainly willing to incur the cost of hiring independent counsel of his choosing (and not Fox Rothschild), you clearly and unequivocally have rejected that proposal."  (Ex. 14.)

492.    However, Potter had never, and has never, offered to retain independent counsel to represent BIH in the Delaware Federal Action.

493.    Potter only offered to defend BIH in the Delaware Federal Action under a joint representation with Potter by counsel of Potter's choosing and under terms that Potter would be able to control the defense of both himself and BIH.

494.    Because Potter breached his duty to pay for BIH's defense, BIH was forced to retain defense counsel in the Delaware Federal Action.

495.    On September 29, 2022, the court in the Delaware Federal Action entered a Final Judgment in favor of the Institutes against BIH, "in the amount of one dollar ($1.00), plus pre- and post-judgment interest, and equitable relief in the nature of a permanent injunction against BIH issued contemporaneously with the entry of this judgment."  (Ex. 22.)

496.    The Institutes subsequently filed a Bill of Costs in the Delaware Federal Action, seeking $36,350.79 in reimbursement from Potter and BIH.  (Ex. 24.)

497.    On September 29, 2022, the court in the Delaware Federal Action entered a Permanent Injunction restricting and prohibiting BIH "from promoting, marketing, offering, or holding any conference, seminar, webinar, or any similar event that provides any content related

to claims and litigation management or that targets claims and litigation management professionals, for a period of two years from the entry of this injunction." (Ex. 23.)

498.    To comply with the injunction, BIH canceled its 2022 Cannabis Conference, 2023 Cannabis Conference, 2024 Cannabis Conference, 2023 Long-Term Care Virtual Conference, 2024 Long-Term Care Virtual Conference, 2023 Cyber Risk Webinar, and 2024 Cyber Risk Webinar.

499.    As a direct result of those cancelations, BIH will suffer at least $762,868 in losses, which BIH reasonably anticipated earning based on the past performance of those conferences and webinars.

500.    BIH also anticipates incurring additional damages and costs to comply with the injunction, including costs associated with restructuring and rebuilding its customer list and conference schedule.

501.    BIH also anticipates incurring additional attorneys' fees in connection with the Delaware Federal Action, including fees related to appeals filed in the Delaware Federal Action.

502.    Under Section 8.01, 8.01(b), and 8.02 Potter had a duty to indemnify BIH for each of those losses and expenses. (Ex. 1, § 8.01, 8.01(b), 8.02.)

503.    On October 7, 2022, BIH sent Potter a Renewed Notice, again demanding indemnification and reimbursement for its defense costs in the Delaware Federal Action. (Ex. 27.)

504.    Potter responded on October 21, 2022, with a letter signed by his counsel in the Delaware State Action, Delaware Federal Action, and this New York Federal Action. (Ex. 28.)

505.    In the October 21, 2022, letter, Potter agreed to indemnify BIH for the $1.00 in compensatory damages that the court imposed against BIH in the Delaware Federal Action. (Ex. 28.)

506.    Potter, however, denied BIH's demand for indemnification for losses resulting from the injunction imposed against BIH in the Delaware Federal Action.  (Ex. 28.)

507.    Potter's refusal to indemnify BIH for losses attributable to the injunction was a breach of his obligation under SPA Section 8.01(b) to indemnify BIH for "any award, claim satisfaction or corollary action taken by Institutes as a result of the" Delaware Federal Action.  (Ex. 1, § 8.01(b).).

508.    In the October 21, 2022, letter, Potter also denied BIH's demand for reimbursement of its defense costs in the Delaware Federal Action, asserting that BIH was unentitled to reimbursement because it declined to allow Potter to control its defense in the Delaware Federal Action.

509.    Potter's letter failed to address the fact that Potter and his counsel were in conflict with BIH, which, under New York law, vested BIH with a right to select counsel of its choosing at Potter's expense.

510.    Potter's refusal to reimburse BIH for its defense costs in the Delaware Federal Action therefore constituted a breach of Potter's duty to provide BIH with a good faith defense in the Delaware Federal Action.

511.    At all times, Beacon and BIH acted in good faith and satisfied their obligations under the SPA, including the indemnification procedures in SPA Section 8.02

512.    To date, Potter has not advanced or reimbursed BIH for any of its defense costs in the Delaware Federal Action.

513.    To date, Potter has not indemnified BIH in the Delaware Federal Action.

514.    Potter therefore breached SPA Sections 8.01, 8.01(b), and 8.02.

515.    BIH requests indemnification and reimbursement for its defense in the Delaware Federal Action in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, having alleged this Third Amended Counterclaim Complaint against Counterclaim Defendant Adam Potter, Counterclaim Plaintiffs Beacon Intercontinental Group, Inc. and Business Insurance Holdings, Inc. pray that the Court award the following relief:

(a)     Damages, including compensatory, general, consequential, equitable and/or punitive damages, lost profits, disgorgement of all monies paid, all other appropriate damages, as well as attorneys' fees and costs in an amount to be determined at trial but in any event no less than $10 million;

(b)     A declaratory judgment stating that (i) BIH is entitled to, and Potter is obligated to provide, indemnification against any and all claims, losses, damages, liabilities, obligations, expenses, including reasonable third party legal fees and expenses, arising or resulting from the Delaware Federal Action; and (ii) BIH is entitled to, and Potter is obligated to reimburse, reasonable costs and expenses, including attorneys' fees and disbursements of counsel incurred by BIH in the Delaware Federal Action;

(c)     An order that Beacon and BIH are prevailing parties under SPA Section 10.01 and awarding them attorneys' fees and court costs incurred in this action;

(d)     Pre- and post-judgment interest; and

(e)     Any other or further relief as the Court may deem just and proper, including, but not limited to, an award of damages pursuant to 28 U.S.C. § 2202.

Dated: Miami, Florida
        December 16, 2022

**DLA PIPER LLP (US)**

By: _/s/ Christopher Oprison_
Christopher Oprison
Florida Bar No. 0122080
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Tel.: (305) 423-8522
Fax: (305) 675-6366
chris.oprison@dlapiper.com
(admitted *pro hac vice*)

David A. Toner
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 335-4500
Fax: (212) 335-4501
david.toner@dlapiper.com

*Attorneys for Defendants/Counterclaim Plaintiffs Beacon Intercontinental Group, Inc. and Business Insurance Holdings, Inc.*